## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| SCOTT T. LEWIS, | |
| Plaintiff, | **Case No. 3:16-cv-1382** |
| v. | |
| The CITY OF NEW HAVEN; Chief of Police NICHOLAS PASTORE, in his individual and official capacities; and Officers VINCENT RAUCCI, ROBERT LAWLOR, VAUGHN MAHER, JOSEPH PETTOLA, and MICHAEL SWEENEY, in their individual capacities; | **COMPLAINT AND JURY DEMAND** |
| Defendants. | |

Plaintiff Scott T. Lewis, by and through his attorneys, the law firms of Neufeld Scheck & Brustin, LLP,  and the Law Offices of Richard Emanuel, states as follows:

### INTRODUCTION

1.      Beginning in early 1991, Plaintiff Scott Lewis was wrongfully arrested, prosecuted, and eventually convicted of a heinous double murder that he did not commit. Although no physical or forensic evidence ever connected him to the crimes, he was convicted on the basis of false testimony that was coerced, fabricated, and covered-up by detectives and supervisors of the New Haven Police Department ("NHPD").

2.      For the nearly two decades that Mr. Lewis was wrongfully incarcerated, he steadfastly maintained his innocence and argued that he had been framed by the NHPD, particularly Defendant Detective Vincent Raucci.

3.      Beginning shortly after Mr. Lewis's conviction, Mr. Lewis's claims of his innocence and Raucci's corruption were substantiated by an 18-month FBI investigation that uncovered

substantial evidence that Raucci had coerced and improperly coached witnesses into providing false statements implicating Mr. Lewis. The FBI investigation also uncovered ties between Raucci and known drug dealers and organized-crime figures.

4.      In 1999, based on the FBI's findings, the Mayor of New Haven officially requested that the NHPD reopen the investigation. But the NHPD refused.

5.      After nearly two decades, the evidence uncovered by the FBI, coupled with additional sworn testimony of a supervising NHPD detective—found to be credible by two different courts—shows that Raucci had openly coerced and fabricated statements from the prosecution's key witness, which ultimately resulted in Mr. Lewis's exoneration and the dismissal of all charges.

6.      Mr. Lewis's innocence and Raucci's misconduct are now so clear that in 2015, the State's Attorney for the Judicial District of New Haven stated in open court "that the key witness [against Mr. Lewis and his co-Defendant, Mr. Stefon Morant,]. . . was not honest in his testimony with respect to both trials, and it's public information that a certain police officer involved in this [Raucci] had put him up to contriving a story."

7.      But Raucci was not the only member of the NHPD responsible for Mr. Lewis's wrongful conviction. From the earliest stages of Raucci's involvement with this case, numerous NHPD detectives and supervisors personally witnessed and learned of Raucci's misconduct. These officers never came forward to report this information to prosecutors. Instead, in continuing to cover up his misconduct for years, they allowed Raucci to operate with impunity, giving him the opportunity to frame Mr. Lewis.

8.      In particular, former NHPD Chief of Police Nicolas Pastore, Lieutenant Robert Lawlor, and Detective Joseph Pettola, were aware of Raucci's unconstitutional tactics and misconduct in

the line of duty. Yet, despite knowing that Raucci was engaging in criminal and official misconduct, including associating with drug dealers and routinely coercing witnesses, Chief Pastore and other NHPD supervisors failed to adequately discipline or supervise Raucci. Instead, they gave him free reign on important homicide investigations.

## JURISDICTION AND VENUE

9.      This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Mr. Lewis's rights as secured by the United States Constitution. This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

10.     This Court has supplemental jurisdiction over Mr. Lewis's state law claims pursuant to 28 U.S.C. § 1367(a).

11.     Venue is proper in the District of Connecticut under 28 U.S.C. § 1391(b), in that this is the District in which the claim arose.

## JURY DEMAND

12.     Plaintiff respectfully demands a trial by jury on all issues and claims set forth in this Complaint, pursuant to the Seventh Amendment of the United States Constitution and Federal Rule of Civil Procedure 38(b).

## PARTIES

13.     Plaintiff **SCOTT T. LEWIS** is, and at all times relevant to this Complaint was, a resident of the State of Connecticut. On May 10, 1995, Mr. Lewis was wrongfully convicted of two counts of murder and two counts of felony murder. On July 21, 1995, Mr. Lewis was sentenced to 120 years of imprisonment. Almost twenty-three years after his initial arrest, and after more than nineteen years of wrongful incarceration, Mr. Lewis was finally released from prison in February 2014 after the federal district court granted his petition for habeas relief.

14.     Defendant **CITY OF NEW HAVEN** is, and at all times relevant to this Complaint was, a municipality located in the State of Connecticut. The City of New Haven was, at all times relevant to this Complaint, officially responsible for the policies, practices, and customs of the NHPD, and was the employer of the individual NHPD Defendants in this matter. During all times relevant to this Complaint, the City of New Haven delegated policy-making authority regarding the NHPD to the NHPD Chief of Police.

15.     Defendant **NICHOLAS PASTORE**, at all times relevant to this Complaint, was an employee of the NHPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New Haven and the NHPD. Pastore served as the NHPD's Chief of Police from approximately February 1990 to early 1997, when he resigned. The Chief of Police is responsible for setting the policies and practices of the NHPD, and is the final policy-maker for police actions on behalf of the City of New Haven. Pastore is named in both his individual capacity and his official capacity.

16.     Defendant **VINCENT RAUCCI**, at all times relevant to this Complaint, was an officer of the NHPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New Haven and the NHPD. Raucci joined North Haven's police force out of high school, and moved over to the NHPD in 1981. During the 1980s, Raucci was a member of the NHPD's Street Crimes Unit. At some point in late December 1990 or early 1991, possibly as a reward for his work on this investigation, Raucci was promoted to detective and joined the Homicide Unit. By the time of his promotion to Homicide, Raucci had been with the NHPD for approximately ten years. Raucci is named in his individual capacity.

4

17.     Defendant **ROBERT LAWLOR**, at all times relevant to this Complaint, was a duly appointed and acting officer of the NHPD acting under color of law and within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New Haven and the NHPD. Lawlor was a member of the NHPD for 26 years. He began as an NHPD patrolman in 1970 and retired as a Lieutenant in 1995 (after Mr. Lewis's conviction), at which time he was a supervisor of the NHPD's investigative services division, which included the NHPD detectives. By January 1991, Lawlor was a sergeant with supervisory responsibilities over the NHPD detectives—including, for example, Raucci and Sweeney—who were involved with the investigation, arrest, and prosecution of Mr. Lewis. Defendant Lawlor is named in his individual capacity.

18.     Defendant **VAUGHN MAHER**, at all times relevant to this Complaint, was a duly appointed and acting officer of the NHPD acting under color of law and within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New Haven and the NHPD. Maher was a member of the NHPD from 1972 through 1993, retiring with the rank of Sergeant. In 1990, he was a detective within the NHPD's homicide division. He participated in the investigation that resulted in Mr. Lewis's arrest, prosecution, and conviction. Maher is named in his individual capacity.

19.     Defendant **JOSEPH PETTOLA**, at all times relevant to this Complaint, was a duly appointed and acting officer of the NHPD acting under color of law and within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New Haven and the NHPD. In 1990 and 1991, he was a detective with the NHPD. He participated in the investigation that resulted in Mr. Lewis's arrest, prosecution, and conviction.

Pettola is named in his individual capacity.

20.     Defendant **MICHAEL SWEENEY**, at all times relevant to this Complaint, was a duly appointed and acting officer of the NHPD acting under color of law and within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New Haven and the NHPD. Sweeney began his employment with the NHPD in September 1968 and retired in December 1998. In early 1991, Sweeney was a detective sergeant with supervisory responsibilities over homicide detectives. Sweeney participated in the investigation that resulted in Mr. Lewis's arrest, prosecution, and conviction. Sweeney is named in his individual capacity.

## FACTUAL ALLEGATIONS

### Mr. Lewis had  no involvement with the murders of Ricardo Turner and Lamont Fields.

21.     At around 4:30 a.m. on October 11, 1990, **Ricardo Turner** and **Lamont Fields** were murdered inside their second floor apartment on Howard Avenue in New Haven, Connecticut.

22.     Responding to a 911 call, NHPD officers found the victims in the apartment bedroom, shot multiple times in the head and torso.

23.     These murders attracted significant public attention in the following weeks and months, in part because Mr. Turner was a former alderman of the City of New Haven. The Governor authorized a $20,000 reward for information leading to an arrest and conviction.

24.     Plaintiff Scott Lewis had absolutely no involvement with the Turner-Fields murders. At the time of the crime, Mr. Lewis was working at his job at a local printing company, accompanied by a number of coworkers who vouched for his alibi.

25.     No physical evidence ever connected Mr. Lewis to the crime. Of the approximately 17 fingerprints lifted from the crime scene, none matched Mr. Lewis, and in 2003, DNA testing

excluded Mr. Lewis as a possible source for any of the biological evidence at the crime scene.

26.     Defendant Detective Vaughn Maher led the NHPD's initial investigation into the murders, conducting or assigning the majority of the investigative tasks. Defendant Robert Lawlor was also involved in the NHPD's initial investigation in a supervisory capacity, including by assigning detectives to conduct various investigative steps. For example, Defendant Lawlor assigned Defendant Raucci to take a statement from a witness who lived in the building where the murder occurred. Upon information and belief, Maher kept Lawlor updated on the progress of the investigation.

27.     Maher reported that the NHPD believed the murder weapon was a .357 revolver. Maher also developed substantial information suggesting that the victims had been involved in drug trafficking and were associated with various gangs.

28.     In particular, as discussed in detail below, Maher developed several independent leads implicating **Michael Cardwell**, a former associate of Mr. Turner's, in the murders.

29.     Mr. Lewis had no personal or professional relationship with Mr. Turner or Mr. Fields— he had never met them. Accordingly, Mr. Lewis's name was not found in any of Mr. Turner's personal effects and was never mentioned in any connection with either of the victims during Maher's initial investigation.

### Mr. Lewis's personal history made him a target for drug kingpin, Frank Parise, and Defendant Vincent Raucci.

30.     Mr. Lewis was raised by his mother in New Haven and attended Eli Whitney Technical High School in Hamden, CT, specializing in the skills needed to work as a printing press operator.

31.     Mr. Lewis subsequently worked at various print stores in and around the New Haven

area, including, beginning in 1990, Minuteman Press.

**32.**     In 1988, Mr. Lewis was married and expecting the birth of a son. Although fully

employed, Mr. Lewis, hoping to make extra money to support his family, began selling drugs.

**33.**     By 1990, although working full-time at Minuteman Press, Mr. Lewis was also selling

drugs as part of an organization run by **Frank Parise**.

**34.**     Mr. Parise was a well-known organized-crime figure and drug dealer in the New Haven

area. After multiple state court arrests and convictions in the early 1980s, on May 30, 1985, Mr.

Parise was federally convicted of conspiracy to possess with intent to distribute seven kilograms

of cocaine and sentenced to 48 months incarceration. On June 17, 1993, Mr. Parise was federally

convicted of possession of a firearm as a convicted felon—a search revealed a handgun and an

uzi-style assault rifle—and sentenced to 21 months imprisonment. In 1995, Mr. Parise and 18 co-

defendants were indicted on wide-ranging federal drug conspiracy charges. *See U.S. v. Frank*

*Michael Parise, et. al*., No. 95-CR-00135 (D. Conn. Sept. 21, 1995). Mr. Parise was eventually

convicted and sentenced to 240 months imprisonment. A cooperating witness in that case

described arrangements Mr. Parise had made to kill those who betrayed him.

**35.**     In 1990, around the time of the Turner-Fields murders, Mr. Parise ran a thriving cocaine

operation. Mr. Lewis, as part of that operation, received drugs from Mr. Parise and sold those

drugs, using the proceeds to repay Mr. Parise.

**36.**     By late 1990, months after the Turner-Fields murders, Mr. Lewis decided to cease his

participation in the drug business.

**37.**     Around this time, Mr. Parise, who knew he was facing a federal weapons charge, asked

Mr. Lewis to take on a larger role in his drug organization. Mr. Lewis, who had just watched a

family member become addicted to drugs and felt responsible, decided instead to leave the drug

business. Accordingly, Mr. Lewis turned Mr. Parise down and informed Mr. Parise that he (Mr. Lewis) wanted to get out of the drug trade.

38.     Shortly thereafter, on or around January 5, 1991, the NHPD raided a house on Clay Street that Mr. Lewis and associates had been using for drug sales. This raid was conducted by NHPD narcotics squad, of which Raucci was a current or former member. Although Mr. Lewis was not at the house at the time of the raid, he lost drugs, and thus he owed Mr. Parise money.

39.     Upon information and belief, both because of this debt and because Mr. Parise felt insulted by Mr. Lewis's refusal to accept a larger role in the organization, Mr. Parise arranged to make an example of Mr. Lewis. To do so, Mr. Parise used Defendant Detective Vincent Raucci, who also worked for Mr. Parise as part of his drug organization.

40.     Well before the Turner-Fields murders, Detective Raucci had developed illicit and illegal connections to Mr. Parise and his criminal organization. Numerous individuals, including both civilians and members of the NHPD, reported to the FBI that Raucci and Mr. Parise appeared to be working together prior to and during the timeframe at issue in this case. For example, NHPD officers and detectives reported witnessing repeated meetings between Raucci and Mr. Parise, which appeared unrelated to any legitimate NHPD business.

41.     In fact, Raucci's dealings with Mr. Parise were illegal. Raucci repeatedly tipped off Mr. Parise as to the times of planned NHPD raids, and Mr. Parise referred to Raucci as his partner.

42.     By virtue of his illicit connections to Mr. Parise, Raucci knew that Mr. Lewis worked for Mr. Parise. Raucci also knew that Mr. Lewis was associated with a house on Clay Street, and that Mr. Lewis had told Mr. Parise he wanted to leave the drug trade.

43.     Upon information and belief, Raucci acted on behalf of and/or in collaboration with Mr. Parise to frame Mr. Lewis for the Turner-Fields murders.

44.    Consistent with Mr. Parise's goal of making an example of Mr. Lewis, when Raucci

arrested Mr. Lewis in April 1991, Raucci told Mr. Lewis, in substance, "You should have never

stopped selling drugs in Fair Haven."

**Defendants fabricate and coerce witness statements falsely implicating Mr. Lewis in the
Turner-Fields murders.**

45.    In January 1991, approximately three months into the investigation, Detective Raucci,

who was not assigned to the case, inserted himself into the investigation and began fabricating

and manufacturing false evidence implicating Mr. Lewis.

46.    First, over the course of approximately three days, Raucci used a consistent approach to

coerce and fabricate statements from three witnesses who knew nothing about the murders—

**Ovil Ruiz** (aka Augustin Castro), **Jose Roque**, and **Stefon Morant**. During each interrogation

Raucci first interviewed the witness off tape. During this off-tape interrogation Raucci threatened

the witness with prosecution—either for the Turner-Fields murders or for unrelated crimes—if

the witness did not agree to provide a statement implicating Mr. Lewis. Raucci then provided the

witness with specific details for the witness to incorporate into an official statement. Finally,

Raucci took a taped statement from the witness using the details that Raucci had provided.

47.    Later, Raucci disclosed the taped statements to prosecutors but affirmatively

misrepresented to prosecutors (both orally and in writing) that all the facts on the tape were

volunteered by the witnesses themselves without coercion or suggestion. Raucci also deliberately

withheld information regarding the witnesses' off-tape denials and the officers' coercive tactics,

failing to report what actually occurred in his official reports.

48.    Other Defendants Sweeney, Pettola, and Maher were present for at least parts of these

witness interviews. These Defendants knew about Raucci's misconduct and knew about the

witnesses' exculpatory statements and yet failed to document or disclose it, failed to prevent

Raucci from engaging in misconduct, and/or affirmatively misrepresented to prosecutors that no

misconduct had occurred.

### *Fabricated Statement #1: Ovil Ruiz*

49.     Raucci obtained his first fabricated statement on January 13 and 14, 1991, from 16 year-

old Ovil Ruiz.

50.     On January 13, 1991, based on a warrant obtained by Raucci, NHPD officers arrested

Ruiz on an unrelated gang shooting and turned him over to Raucci for interrogation.

51.     Although Raucci had no reason to believe that Ruiz had any information about the

Turner-Fields murders, Raucci used Ruiz's arrest on the gang shooting as leverage against Ruiz.

Raucci threatened Ruiz with life imprisonment if he did not implicate Mr. Lewis in the murders.

52.     Although Ruiz repeatedly stated that he did not know anything about the murders, Raucci

provided Ruiz with details about the murders—including the victims' names, the location, and

the fact that they had been shot—and told Ruiz exactly what to say to implicate Mr. Lewis.

Raucci even drove Ruiz around New Haven to show him the key locations that Raucci would

incorporate into Ruiz's statement (including the victim's Howard Avenue address, the Clay

Street house, and the Mill River).

53.     After denying multiple times that he knew anything about the crime, Ruiz eventually

gave a taped statement falsely stating that Mr. Lewis and Mr. Turner were involved in a

homosexual relationship, and Ruiz had seen Mr. Lewis visiting Mr. Turner at the Howard

Avenue address. Ruiz also stated that after the murders he overheard Mr. Lewis having a

conversation at the Clay Street house with Stefon Morant in which Mr. Lewis admitted

committing the murders. Ruiz also falsely claimed that in the weeks following the crime he

11

witnessed Mr. Lewis throw a gun off of a bridge and into the Mill River.

54.     As Raucci and Ruiz both knew, this statement was a complete fabrication. In other words, although the tape made it appear that Ruiz voluntarily provided information that he knew about the crime without suggestion or coercion, all of the information was either provided by Raucci or manufactured out of thin air to be consistent with the story Raucci wanted Ruiz to tell.

55.     In fact, Ruiz never had any truthful information tying Mr. Lewis to the murders, and Ruiz never witnessed any of the inculpatory events described in his statement.

56.     Raucci subsequently misrepresented to prosecutors that Ruiz had volunteered the information on the taped statement based on his personal knowledge and without suggestion or coercion. Raucci never informed prosecutors that Ruiz repeatedly denied having any knowledge of the crime, that Raucci coerced Ruiz, or that Raucci fed Ruiz the information that Ruiz provided on tape.

57.     Although Ruiz retracted this statement and fully recanted on multiple occasions—both prior to trial and after Mr. Lewis's conviction—he testified against Mr. Lewis at trial.

58.     Ruiz pled guilty to the gang shooting and received a lenient sentence. The information that Ruiz received lenient treatment in exchange for his testimony against Mr. Lewis was not disclosed to Mr. Lewis before his criminal trial.

> ***Defendants Michael Sweeney, Joseph Pettola, and Robert Lawlor are aware of Raucci's misconduct with Ruiz, but suppress all evidence of that misconduct.***

59.     Much of Raucci's misconduct with Ruiz occurred in open view of Raucci's supervisors and other senior detectives within the NHPD.

60.     For example, Defendant Sergeant Michael Sweeney witnessed Raucci using unlawful tactics to obtain Ruiz's false statement, including coercing Ruiz and feeding Ruiz information. Sweeney never documented and never disclosed to prosecutors either Ruiz's statements denying

any knowledge or Raucci's misconduct.

61.     When Raucci first brought Ruiz to the police station, claiming that Ruiz had information regarding the Turner-Fields murders, Sweeney interviewed Ruiz alone. During this un-taped interview, Ruiz truthfully insisted that he knew nothing about the murders. Sweeney never documented or reported to prosecutors that Ruiz initially denied any knowledge of the Turner-Fields murders before falsely implicating Mr. Lewis.

62.     Although Sweeney knew that Raucci had a reputation for using inappropriate tactics with witnesses, Sweeney permitted Raucci to join the interview and to question Ruiz. After Ruiz again stated that he knew nothing about the murders, Sweeney witnessed Raucci deliberately provide Ruiz specific details about the murders for Ruiz to parrot back. Sweeney also witnessed Raucci falsely promise Ruiz that he would be released if he stated that he had been the driver on the night of the murders. Again, Sweeney never documented Raucci's misconduct and never reported it to prosecutors.

63.     As a Sergeant, Sweeney understood that Raucci's conduct was blatantly inappropriate— that it was impermissible to feed Ruiz information or suggest that Ruiz would be released in exchange for a statement implicating Mr. Lewis, particularly when Ruiz had repeatedly denied any personal knowledge. Yet, Sweeney repeatedly permitted Raucci to continue in this manner.

64.     As the interrogation wore on, Defendant Detective Joseph Pettola arrived at the police station to begin his shift. Like Sweeney, Pettola was also familiar with Raucci's corrupt practices because in a previous, unrelated case, Pettola had witnessed Raucci attempt to fabricate evidence by planting drugs on a suspect. Pettola had also personally witnessed Raucci meeting with Mr. Parise on what clearly was not NHPD business.

65.     Sweeney brought Pettola up to speed regarding the interrogation and asked Pettola to join

13

Raucci in the interview room. Sweeney then left the interview for good and never documented or reported Raucci's misconduct or Ruiz's many exculpatory statements to prosecutors.

66.    Raucci, with Pettola present, continued the interrogation, coercing Ruiz until he agreed to give a false statement on tape. Like Sweeney, Pettola never documented or reported Raucci's misconduct or Ruiz's repeated statements that he knew nothing about the murders.

67.    Although Sweeney did not disclose the exculpatory information regarding Ruiz and Raucci to prosecutors prior to Mr. Lewis's criminal trial, during post-conviction proceedings, Sweeney testified that in 1991 he did advise his superior, then-Sergeant Robert Lawlor.

68.    Sweeney testified that soon after Raucci fabricated Ruiz's statement, Sweeny informed Lawlor that Raucci should be pulled off of the investigation because he had fabricated Ruiz's statement and Ruiz's statement was not reliable. Sweeney also testified that when he learned that the NHPD had made an arrest, he again spoke with Lawlor and asked him if the arrest was based on Ruiz's statement. When Lawlor responded that it was, Sweeney again told Lawlor that Ruiz's statement is a lie and was fed to him by Raucci.

69.    In direct contrast to Sweeney's sworn testimony, Lawlor has testified that no such conversations with Sweeney ever took place. In 1995, however, around the time of Mr. Lewis's conviction, Lawlor did admit to FBI investigators that he knew at the time that Raucci's investigation into Mr. Lewis had been "troublesome."

70.    Either Sweeney never reported the exculpatory information about Ruiz to Lawlor, or Sweeney did report this information and Lawlor suppressed it. In any event, prosecutors never learned this exculpatory information and were instead mistakenly led to believe that Ruiz's statement was true and voluntary.

    *Fabricated Statement #2: Jose Roque*

**71.**     On January 15, 1991, the day after coercing and fabricating Ruiz's false statement, Raucci, this time with Defendant Maher, coerced a second witness, Jose Roque, into providing another false statement implicating Mr. Lewis.

**72.**     Roque was a sixteen year-old who knew both Mr. Lewis and Ruiz from the Fair Haven neighborhood of New Haven.

**73.**     Like Ruiz, Roque initially told Raucci and Maher that he did not know anything about the murders and did not have any information implicating Mr. Lewis. Knowing that Roque had no relevant information, Raucci and Maher coerced Roque by threatening to arrest him for the Turner-Fields murders if he did not parrot back a false statement implicating Mr. Lewis.

**74.**     As with Ruiz, Raucci and Maher provided Roque with information off tape, and then had Roque parrot back that information during a taped statement. Raucci and Maher subsequently affirmatively misrepresented to prosecutors that they had not fed any information to Roque, and that he voluntarily provided all the information on the tape.

**75.**     In the false taped statement, Roque claimed to have heard the same conversation as Ruiz—a conversation involving Mr. Lewis and Mr. Morant at the Clay Street house in which Mr. Lewis admitted committing the murders. Roque also claimed, like Ruiz, to have witnessed Mr. Lewis throw a gun from a bridge into a river. Roque described the weapon as a .357 revolver.

**76.**     Maher and Raucci were both present for Roque's taped statement. Maher even signed Roque's statement as a witness.

**77.**     Of course, Roque did not actually witness any of the events discussed in his statement because they never happened. Roque's statement was consistent with Ruiz's statement from a day earlier because Raucci told both Roque and Ruiz exactly what to say.

**78.**     Neither Raucci nor Maher ever reported their misconduct with regard to Roque's

interrogation—they never reported that Roque told them that he knew nothing about the crimes, they misrepresented that all of the inculpatory information in Roque's statement was voluntarily supplied by Roque without suggestion or coercion, and they misrepresented that they had not stopped and started the tape in order to provide Roque with additional information.

79.     After he was released, Roque retracted his false statement. At Mr. Lewis's trial, Roque testified under oath that his taped statement was false and that he had simply parroted what Raucci told him to say.

80.     In fact, Roque testified that Raucci repeatedly stopped the tape, told him what to say, and then restarted the tape. Raucci, by contrast, denied committing any misconduct during Roque's interview and specifically denied ever stopping-and-starting the tape during Roque's statement. Years later, the FBI's forensic lab conclusively established that Roque's tape had been stopped at least 11 times during Roque's twenty-two minute statement.

### Fabricated Statement #3: Stefon Morant

81.     On January 16, 1991, the day after obtaining Roque's fabricated statement, Raucci coerced and fabricated a statement from the other individual implicated by Ruiz's and Roque's alleged statements—Mr. Stefon Morant.

82.     As Ruiz and Roque had, Mr. Morant first truthfully denied being involved in the murders or having any knowledge of Mr. Lewis's involvement. Instead of accepting Mr. Morant's truthful denials, Raucci coerced Mr. Morant, who was intoxicated at the time, by continuing to interview him for four or five hours and threatening to arrest him for the murders if he did not make a false statement implicating Mr. Lewis.

83.     Raucci never reported what actually happened during Mr. Morant's interview to prosecutors. He either misrepresented the truth orally or in writing, or simply suppressed it.

16

**84.**     Raucci, joined later by Maher, eventually succeeded in suggesting and coercing a false taped statement from Mr. Morant. In this false statement, Mr. Morant stated that Mr. Lewis had driven them to the Howard Avenue apartment, that Mr. Lewis went into the building alone, and that Mr. Lewis later came out running. Mr. Morant also stated that he spoke to Mr. Lewis about the murders at the Clay Street house and later witnessed Mr. Lewis throw a gun into the river.

**85.**     Of course, none of these events ever actually took place.

**86.**     Mr. Morant made this statement only after being coerced by Raucci and Maher. Mr. Morant described events that were consistent with Ruiz's and Roque's false statements only because Raucci told all three witnesses what to say.

**87.**     Mr. Morant immediately retracted his statement and not only refused to sign it, but told NHPD detectives that the statement was a lie. Based in part on his coerced statement, however, Mr. Morant was also charged with committing the murders.

**88.**     In order to strengthen the fabricated case against Mr. Lewis, Raucci attempted to coerce and/or fabricate additional statements from witnesses who Raucci knew had no knowledge of the crimes. Although he succeeded in obtaining additional statements, these witnesses also recanted and the statements were not used against Mr. Lewis at trial.

**Defendants Raucci and Maher attempt to solidify their case against Mr. Lewis.**

**89.**     Raucci and Maher also engaged in misconduct designed to ensure that Mr. Lewis could not present a viable third-party defense at trial.

**90.**     Before Raucci became involved in the investigation, Maher, as lead investigator, developed substantial evidence implicating Michael Cardwell as the NHPD's prime suspect.

**91.**     Maher discovered that Cardwell's name, his girlfriend's name, and several phone numbers associated with both Cardwell and his girlfriend were found throughout Mr. Turner's

personal datebook and agenda. Seven individuals, including the victim's ex-wife and Cardwell's own brother, confirmed Cardwell was an associate of both victims.

92.     About one month after the murders, a formally-registered confidential informant—whom the NHPD deemed "known and reliable" because he had previously provided officers and/or detectives with information relative to homicides and/or serious felonies that had proven to be true and accurate and resulted in numerous arrests and convictions—told the NHPD that Cardwell *admitted* to the informant that *he* had committed the murders.

93.     Maher knew this information and met with the informant at least twice during November 1990. The informant provided Maher with numerous important details that were consistent with the physical evidence and Maher's working theory of the crime, including: (1) that the informant had known Cardwell for years; (2) that Cardwell had previously run a narcotics organization with one of the victims, but the two were currently at odds; (3) that Cardwell admitted that his brother was supposed to whistle from the street when there was no activity as a sign to carry out the murders; (4) that Cardwell had admitted that he shot five times, killing Turner first and then Fields, who was lying in bed; and (5) that Cardwell had stashed the murder weapon at his girlfriend's house in New Britain, Connecticut.

94.     These details were largely corroborated by independent evidence, including non-public information about the crime scene and a statement from a witness who heard a man whistling on the street shortly before the murders.

95.     Maher even received information from an NHPD officer that a second informant implicated Cardwell in the murders.

96.     By January 1991, once Raucci became involved in the Turner-Fields investigation, all of this information regarding Cardwell was known to Maher and Raucci, and upon information and

belief to Lawlor, and documented in the NHPD's file.

97.     Despite all of this evidence implicating Cardwell, neither Maher nor Raucci made any attempt to interview Cardwell's girlfriend or search her house, even though Cardwell had admitted to the informant that the murder weapon was in his girlfriend's house (for which Maher had an address and phone number). Nor did Maher or Raucci conduct an identification procedure with the witness who saw a man whistling on the street just prior to the murder.

98.     Once Raucci became involved in the investigation, rather than follow up on the important Cardwell lead, Raucci and Maher used the fabricated witness statements to close the case. Maher also wrote a report downplaying the evidence pointing to Cardwell and falsely reported that the informant was unable to support the allegations against Cardwell "with any evidence or information," thereby closing the investigation into Mr. Cardwell and clearing the way for Mr. Lewis's prosecution.

99.     In 2005, years after Mr. Lewis's conviction, the State's Attorney's Office agreed to conduct a photographic identification procedure with the witness who was known to, and ignored by, Maher and Raucci. At that photographic identification procedure, the witness identified Cardwell from two eight-person arrays as the person she saw across the street from the Howard Avenue building just minutes before the murders.

**Mr. Lewis is wrongfully arrested, prosecuted, and convicted based on fabricated evidence.**

100.    On April 12, 1991, based on the fabricated and/or coerced statements of Ruiz, Roque, and Morant, Raucci obtained an arrest warrant for Mr. Lewis that charged him with two counts of murder and two counts of felony murder. The warrant repeated the fabricated statements that Raucci obtained from Ruiz, including the allegations that Mr. Lewis and Mr. Turner were involved in a homosexual relationship.

19

**101.**    In authorizing this arrest, prosecutors at the New Haven State's Attorney's Office did not know about the NHPD's misconduct to this point. In particular, prosecutors did not know that Raucci and other Defendants had coerced and fabricated statements from Ruiz, Roque, or Morant. Prosecutors did not know that these witnesses had made numerous exculpatory statements or that the NHPD had recklessly failed to investigate Michael Cardwell.

**102.**    Although initially arrested on April 15, 1991, Mr. Lewis was not prosecuted at that time. This was because, on April 26, 1991, Ruiz recanted his statement in a notarized document, and because Mr. Morant, although subpoenaed, refused to testify against Mr. Lewis at a probable cause hearing. In his recantation, Ruiz truthfully wrote that Mr. Lewis never told him anything about the murders and that Ruiz was not with Mr. Lewis at the time the murders occurred.

**103.**    As a result of Ruiz's recantation and Mr. Morant's refusal to testify, prosecutors at the New Haven State's Attorney's Office filed a substitute information with lower charges. Based on the reduced charges, the court lowered the bail amount and Mr. Lewis eventually succeeded in posting bail.

**104.**    Soon after, Raucci obtained another fabricated statement from Ruiz. After Raucci threatened to prosecute Ruiz and fed Ruiz additional information, Ruiz provided a taped statement that he was in the car with Mr. Lewis and Mr. Morant when they drove to the victims' apartment and committed the murders. Both Raucci and Ruiz understood that this new statement was yet another fabrication.

**105.**    In August 1994, based on all the prior fabricated evidence, Raucci obtained a second arrest warrant charging Mr. Lewis with murder and felony murder—the same charges that were reduced years earlier. Raucci's application was again based on false and fabricated witness statements, including from Morant and Ruiz.

**106.**    Mr. Lewis was re-arrested on September 12, 1994.

**107.**    A probable cause hearing was held on March 3 and 16, 1995, and the murder and felony murder chargers were permitted to go to trial.

**108.**    By this time, although he too had maintained his innocence, Mr. Morant had been wrongfully convicted, based in part on Raucci's testimony. In addition to maintaining his own innocence, Mr. Morant also stated that he had no information implicating Mr. Lewis.

**109.**    Mr. Morant's taped statement was not used against Mr. Lewis at his trial.

**110.**    In April and May of 1995, Mr. Lewis was tried in the Superior Court for the Judicial District of New Haven.

**111.**    Ruiz was the State's key witness. His testimony was the only evidence that linked Mr. Lewis to the scene of the crime. Despite multiple written and oral motions for disclosure, the State failed to disclose (because the prosecutors did not know) much of the exculpatory evidence discussed above, including Ruiz's oral statements to Raucci, Sweeney, and Pettola, denying any knowledge whatsoever of the murders, as well as evidence that Raucci and Maher inappropriately coached and coerced several witnesses (including Ruiz, Roque, and Morant) into making inculpatory statements against Mr. Lewis.

**112.**    By the time of Mr. Lewis's trial, Roque had completely recanted his taped statement. At trial, Roque testified that he had no information implicating Mr. Lewis and that the taped statement was false. Roque truthfully testified that Raucci had threatened to charge him with the murders and to put him on a one million dollar bond if he did not tell Raucci what he wanted to hear. Roque testified that Raucci even coached him during the statement by stopping the tape and telling Roque what to say.

**113.**    Despite this testimony, the transcript of Roque's coerced/fabricated taped statement was

entered into evidence against Mr. Lewis.

**114.**   The defense presented multiple alibi witnesses, including Mr. Lewis himself, who

testified that he had been working at the printing company at the time of the murders.

**115.**   On May 10, 1995, Mr. Lewis was found guilty of two counts of murder and two counts of

felony murder. He was later sentenced to two consecutive 60-year terms.

**116.**   Mr. Lewis' felony murder convictions were later vacated by the Connecticut Supreme

Court in *State v. Lewis*, 717 A.2d 1140 (Conn. 1998), and he was resentenced to 120 years.


**The NHPD's unconstitutional pattern, practice, or custom of coercing, fabricating, and/or suppressing witness and suspect statements.**

**117.**   The City of New Haven, by and through its final policymakers at the NHPD, had in force

and effect during the Turner-Fields investigation and for years before and after, a policy, practice

or custom of unconstitutional misconduct relating to witness statements. In particular, NHPD

officers and detectives used unconstitutional and/or coercive techniques to fabricate and/or

coerce false inculpatory witness and suspect statements, and to suppress exculpatory witness

statements.

**118.**   The City of New Haven, by and through its final policymakers at the NHPD, also had in

force and effect during the Turner-Fields investigation and for years before and after, a policy,

practice or custom of failing to adequately supervise and discipline NHPD officers and detectives

in the exercise of their constitutional obligations, including their obligations not to fabricate

evidence, to commit perjury, and to disclose exculpatory evidence.

**119.**   The NHPD and Chief Pastore's failure to supervise and discipline Raucci, and instead to

promote and empower him, is just one example of the NHPD's unconstitutional conduct. *See*

*infra* ¶¶ 133–151. In fact, Raucci was just one of many NHPD officers and detectives engaged in

such unconstitutional conduct, none of whom were not adequately supervised or disciplined.

**120.**   In 1982, a federal jury found NHPD officer **Mel Cartoceti** liable for using excessive force in the arrest of 33-year-old postal employee Donald Dinkins. Cartoceti and another officer maced Mr. Dinkins in the face and repeatedly beat him. The jury also concluded that Cartoceti "knowingly and deliberately filed a false report" under penalty of perjury. Although Internal Affairs nominally investigated this incident, it cleared Cartoceti of any wrongdoing (as they had done after numerous other complaints). Rather than disciplining Cartocetti, the NHPD promoted him to detective. NHPD **Chief of Police William Farrell** publicly commented that he was satisfied with Internal Affairs' response.

**121.**   In July 1984, Detective **Anthony DiLullo** was named as a defendant in a malicious prosecution lawsuit. At trial, DiLullo admitted to misquoting statements people gave him for an arrest warrant application and to leaving out the fact that one witness, the parking garage attendant, identified someone completely different as the killer.

**122.**   In August 1991, Eric Ham brought a federal civil rights action against NHPD Detectives **Joseph Greene** and **Michael Sweeney** claiming false arrest and malicious prosecution. Mr. Ham, who had been arrested on February 13, 1991 for a January 20, 1991 murder, alleged that Greene and Sweeney knowingly made misleading statements and omitted material information from their affidavit in order to obtain the arrest warrant. In particular, Greene and Sweeney failed to disclose that a key witness mentioned throughout the affidavit made two prior statements in which he did not identify Mr. Ham as the assailant. A jury returned a verdict in favor of Mr. Ham for nearly $1,000,000 in damages. *See Ham v. Greene*, 248 Conn. 508, 729 A.2d 740 (1999).

**123.**   On May 8, 1990, Terrance Gamble was shot and killed. His murder was investigated by the NHPD, including by Detectives **Anthony DiLullo** (*see supra ¶* 121) and **Joseph Greene**

(*see supra ¶* 122). Two days after the murder, Detectives DiLullo and Greene obtained a tape-recorded statement from a witness implicating Maceo Streater. The next week, the witness met with the detectives to read and review her statement, signing the last page. At Mr. Streater's trial, the witness swore that DiLullo and Greene coerced her into providing the statement. She testified that the police were "chasing after her" following the incident, and that Detective Greene had come to her house several times. She also said that he had stopped the tape several times during her statement to tell her what to say, and that the statement was not true. The Court did not allow Mr. Streater's counsel to question DiLullo regarding the fact that he was a defendant in three pending federal civil rights actions that included allegations of coercion and intimidation.

124.    On September 21, 1991, two individuals were murdered outside of a New Haven diner. In 1994, Daryl Valentine was convicted of those murders based on the investigation of NHPD Detectives **Joseph Greene** (*see supra ¶¶* 122–123) and **Anthony DiLullo** (*see supra ¶¶* 121, 123). Mr. Valentine has consistently maintained his innocence. At trial, two witnesses testified that they were coerced and bribed by Detective Greene into making written and tape-recorded statements against Mr. Valentine. One witness testified that she had lied in the tape-recorded statement, that Detective Greene had threatened her with jail time in order to elicit her statement, and that after she provided the recorded statement, Detective Greene bought her alcohol and cigarettes and gave her money to buy cocaine. *See State v. Valentine*, 255 Conn. 61, 762 A.2d 1278 (2000). Another witness also testified that she told Detective Greene that she was not present at the diner during the shooting and that she fabricated her statement under pressure and bribes from Detective Greene.

125.    In the early 1980s, NHPD Officer **Billy White**, who already had a long history of alleged and proven misconduct, received a reprimand for "conduct unbecoming of an officer" and

"failing to satisfactorily perform the tasks of an officer." The NHPD had already concluded in previous cases that White had fabricated evidence by planting drugs on victims and then arresting them. In this case, Officer White pointed a gun at the heads of several schoolchildren who were not under arrest and yelled: "The first n***** who moves will get his fucking head blown off." During the investigation of this incident, the NHPD concluded that White had lied in his reports and subsequent testimony. Yet, NHPD **Chief of Police Farrell** chose to take no action beyond the basic reprimand.

126.    In April 1990, NHPD **Chief Pastore** decided to again promote then-Sergeant **Billy White**. Pastore promoted White to head of the Criminal Intelligence Section of the NHPD. One of the goals of White's new position was to assist Chief Pastore in responding to community complaints of excessive force and ineffective drug policing. (*See infra* ¶ 127). Shortly before this promotion, White and four fellow officers were sued by the mother of a 13-year old boy who claims that White and others beat her son for no apparent reason. White remained active in the NHPD until approximately 2007, when he was arrested by the FBI in connection with illegal activities while a member of the NHPD's Narcotics Enforcement Unit. White eventually pled guilty to corruption-related charges.

127.    In the late 1980s and early in 1990, a group of patrolling NHPD officers made what the public perceived to be a concerted effort to increase seemingly random police harassment and beatings of New Haven's black and Hispanic teenagers. Those beatings included the December 12, 1989 beating of Rayford Boykin, which prompted responses from the local NAACP. Despite a public outcry, NHPD **Police Commander Leonard Gallo**, who oversaw the NHPD's main anti-drug offensive, said that he saw no major problem.

128.    In 1993, Commander **Gallo** was the highest-ranking officer working a weekend shift

25

when a 20-year-old black man was shot. Although Gallo told the *New Haven Register* that the victim was involved in the drug trade, it turned out the victim was a volunteer in a community group discouraging drug use.

**129.**     From approximately 1986 through his resignation in 1993, NHPD **Officer Vincent Riccio** had 14 complaints filed against him. None of these 14 complaints resulted in any official disciplinary action. In fact, in just seven years, Riccio was promoted to Sergeant and was even the second officer that **Chief Pastore** selected to pioneer his community-based policing program.

**130.**     In 1996, Philip Cusick was shot to death in New Haven's Fair Haven neighborhood, allegedly by a drug dealer. The NHPD reported that they had no reason to believe Cusick was involved in a drug transaction. In 1998, NHPD detectives taped an interview of a Fair Haven gang member who said that he witnessed the murder and identified a fellow drug dealer as the murderer. An NHPD supervisor kept a transcript of the interview in his desk drawer and the tape disappeared. The NHPD never notified North Haven Police, who were also investigating the case, about the interview, and the NHPD never interview or pursued the killer.

   **a.**     Two years later NHPD launched its own internal investigation, implicating **Captain Brian Sullivan**, the NHPD's chief of detectives, and his deputy, **Edward Kendall**. Sullivan claimed that **Chief Melvin Wearing** told him to stop the investigation for budgetary reasons.

   **b.**     Sullivan was eventually arrested on charges related to his suppression of the statement and hindering the investigation. The NHPD's Internal Affairs report also noted that Chief Wearing overruled his own internal affairs investigators in their efforts to obtain "untainted testimony," and that although Kendall took actions that could easily be interpreted as tampering with a witness, Wearing did nothing when he learned of what

26

Kendall did.

**131.**   In addition to the misconduct discussed above, the NHPD also exhibited a long-standing pattern of concealing exculpatory information in connection with witness interviews, including by engaging in misconduct prior to taking a taped witness statement or by destroying a taped statement prior to disclosing the tape to the defense:

> **a.**   In 1984, in *State v. Myers*, 193 Conn. 457, 467–68, 479 A.2d 199 (1984), the Connecticut Supreme Court determined that "a [tape-recorded] statement of the state's principal witness was deliberately destroyed according to a long-standing policy of the [NHPD], notwithstanding the pendency of serious criminal charges."

> **b.**   In *State v. Mullings*, 202 Conn. 1, 6, 519 A.2d 58 (1987), NHPD Detective Donna Amato erased the victim's tape-recorded statement and "misplaced" the transcript.

> **c.**   *State v. Williamson*, 212 Conn. 6, 7, 562 A.2d 470 (1989), presented the Connecticut Supreme Court "with no less than [its] sixth occasion since 1981 to consider whether the New Haven police department's destruction or loss of a witness' statements requires the striking of the witness' testimony in an ensuing criminal trial." In this case NHPD Detective **Whitney Epps** "conducted the interview by tape recording each question he asked [the witness], shutting the recorder off while she answered, and then reactivating it to repeat her answers himself." *Id*. at 10. The transcript of the interview survived, but the tape was not preserved: "although [Epps] knew that department policy recently had changed to require the preservation of such tape recordings, he had neglected to tell the [police] stenographer to save the recording." *Id*.

> **d.**   In *State v. Johnson*, 214 Conn. 161, 164, 571 A.2d 79, 81 (1990), the state Supreme Court again noted that the NHPD had destroyed tape recordings of multiple witnesses.

**e.**   Similarly, in *State v. Belle*, 215 Conn. 257, 263-64, 576 A.2d 139 (1990), overruled on other grounds, *State v. Person,* 236 Conn. 342, 352-53, 673, A.2d 463 (1996), the Court found that the NHPD had again destroyed taped statements given by witnesses to Detective **Robert Coffey**.

**f.**   In *State v. Jones*, 29 Conn. App. 304, 307–08, 615 A.2d 149 (1992), the Appellate Court of Connecticut set aside a conviction after a tape of a police report made by NHPD Officer **Frank Roberts** had been destroyed. The Jones court noted that "the facts of this case necessitate this court's return, yet again, to the New Haven police department's policy of destruction of taped statements…" *Id*. at 310.

**g.**   There are numerous additional examples of the destruction of such taped evidence. *See, e.g.*, *State v. Cerilli*, 222 Conn. 556, 572–74. 610 A.2d 1130 (1992); *In re Jesus C.*, 21 Conn. App. 645, 646–48, 575 A.2d 1031, cert. dismissed, 216 Conn. 819, 581 A.2d 1055 (1990).

**132.**   Upon information and belief, NHPD officers and detectives routinely failed to disclosed pre-tape interviews and even taped interviews when the witnesses' statements did not suit them, and covered up these failures by disclosing transcripts of selected portions of interviews.

**NHPD officials, including Chief of Police Pastore, are aware of Raucci's history of criminal and official misconduct, but do nothing to stop Mr. Lewis's prosecution.**

**133.**   In addition to the serious misconduct of the numerous other NHPD officers and detectives discussed above, NHPD Chief of Police Pastore and other NHPD high ranking officials and supervisors were also on notice of Defendant Raucci's own pattern of unconstitutional and illegal behavior.

**134.**   Yet, Chief Pastore and other NHPD supervisors failed to take any action to adequately

supervise Raucci in the course of his investigations, to review the investigations he had
completed, or to discipline him for his misconduct. Instead, Raucci was promoted and permitted
to lead high-profile investigations.

135.    Chief Pastore in particular knew, or had reason to know, of Raucci's lead role in the
Turner-Fields investigation both because the crimes themselves were particularly high profile—
Turner was a former alderman of the City of New Haven, and the NHPD sought and obtained the
Governor's authorization for a $20,000 reward for information—and because Raucci had a
particularly close relationship with Chief Pastore—Raucci was known to frequent Chief
Pastore's office and behave in an unusually casual and cavalier manner.

136.    Raucci's reputation for engaging in criminal and/or official misconduct was well known
through the NHPD. In the late 1980's, for example, Raucci openly asked **Defendant Pettola** to
join him in planting drugs on an individual during a traffic stop. After failing to find a weapon
that a confidential informant had claimed would be in the car, Raucci suggested to Pettola that
they plant a small amount of cocaine (which Raucci produced from his pocket) in order to make
an arrest. Based on the incident, Pettola thought of Raucci as a "dirty cop."

137.    At the time, Raucci and Pettola were members of the NHPD's Street Crimes Unit. Soon
after, Raucci was promoted to Homicide.

138.    Around this same time, Pettola also repeatedly witnessed Raucci interacting with Mr.
Parise, whom Pettola knew to be a drug dealer. It was clear to Pettola that these interactions had
no legitimate police purpose. Similarly, another former NHPD officer also witnessed Raucci
interacting with Mr. Parise on several occasions in Fair Haven prior to 1993. These meetings
were clearly unrelated to NHPD business. Pettola and the NHPD officer either reported Raucci's
interactions with Mr. Parise to their superiors, who suppressed it, or Pettola and the officer

suppressed the information themselves.

**139.**   **Chief Pastore** was specifically informed on more than one occasion by Hector Ortiz, a

civilian, that Mr. Ortiz knew Raucci to be a corrupt officer. Mr Ortiz knew about Raucci's illicit

associations with Mr. Parise. Pastore dismissed Mr. Ortiz's concerns.

**140.**   Moreover, on multiple occasions prior to Mr. Lewis's trial and conviction, Raucci

engaged in misconduct with witnesses that was similar to his tactics with Ruiz, Roque, and

Morant. This misconduct was known to high level NHPD supervisors, including Chief Pastore.

**141.**   For example, on or around May 10, 1991, Raucci coerced a witness into providing a

taped statement implicating Raucci's suspect in the high-profile murder of Yale University

student Christian Prince. Like Jose Roque in this case, the witness recanted and testified at trial

that, after being arrested on unrelated drug charges, he was coerced by Raucci into making the

taped statement that incorporated details provided to the witness by Raucci. Given the high-

profile nature of the Prince murder, supervisors up to and including Chief Pastore, knew or

should have known about the allegations of misconduct made against Raucci.

**142.**   Raucci continued this pattern of fabricating witness statements through the time of Mr.

Lewis's trial and conviction in 1995. Raucci was assigned as the lead investigator regarding the

August 1995 stabbing murder of Kevin "Goober" Brahan. In that investigation, just like he had

done with Ruiz in this case, Raucci first interviewed a witness off tape and then later obtained a

taped statement that contradicted the witness's prior statements. Upon information and belief,

Raucci's supervisors at the time included Defendants Pastore and Lawlor.

**143.**   **Defendant Lawlor** later provided sworn testimony that between 1990 to 1995, he had

received complaints of misconduct by Raucci.

**144.**   In December 1995, NHPD internal affairs investigators informed Chief Pastore that they

had determined that Raucci had struck a suspect in the face with the butt of a large weapon during the course of an arrest, and that Raucci had lied about the incident to NHPD investigators.

145.    Finally, Raucci's misconduct, including his work with drug dealers like Mr. Parise, led to him developing a drug problem, which NHPD supervisors like Chief Pastore also knew about.

146.    The FBI's investigation into Raucci uncovered evidence that Raucci used drugs beginning in the late 1980s, while a member of the NHPD Street Crimes Unit, until well after Mr. Lewis's trial and conviction. FBI surveillance witnessed Raucci frequenting drug locations with no legitimate police reason for doing so. The FBI's investigation also confirmed that NHPD supervisors, including Chief Pastore, were aware of Raucci's drug habit.

147.    In or around May 1995, Defendant Lawlor, by then a Lieutenant and head of detectives, instructed another officer to follow Raucci after Raucci failed to respond to repeated radio calls on several occasions. On two consecutive nights, the officer followed Raucci to a known drug location and observed him staying inside for several hours each night. When confronted later, Raucci said the house was occupied by drug dealers, prostitutes, and one of his confidential informants. Chief Pastore ordered Raucci to stay out of the area, but investigators and Chief Pastore soon learned that Raucci disregarded this direction and moved next door.

148.    Although the NHPD opened multiple Internal Affairs investigations into Raucci in early 1995, it was not until February 1996, following an Internal Affairs investigation into Raucci's acceptance of overtime pay for work he did not perform, that Raucci was suspended. Upon information and belief, this Internal Affairs investigation commenced prior to Mr. Lewis's conviction and sentencing.

149.    The NHPD's eventual discipline of Raucci came too late for Mr. Lewis, who had already been prosecuted, convicted, and incarcerated based on Raucci's fabricated evidence.

**150.**    In March 1996, the State's Attorney charged Raucci with second-degree larceny in connection with the overtime pay scheme. On April 11, 1996, Raucci resigned from the NHPD, with at least partial benefits.

**151.**    In August 1997, after Raucci was arrested by the NHPD following a dispute with his then-wife, he fled to New Mexico. When Raucci was arrested by New Mexico authorities, the NHPD instructed that Raucci be set free, explaining that the charges did not "fit the criteria" for extradition. Raucci was interviewed by New Mexico authorities in connection with a number of alleged crimes between October 1998 and August 1999, and was accused of stealing thousands of dollars while living in New Mexico. On June 20, 1999, the FBI went to Raucci's trailer in Silver City to arrest him on charges of larceny and domestic abuse, but Raucci had fled. In July, the NHPD confirmed that New Haven authorities were attempting to bring Raucci back to Connecticut and arrest him. Finally, on July 15, 1999, Raucci was arrested after a four-hour standoff with FBI agents and sheriff's deputies at his mobile home in Silver City.

**An independent FBI investigation reveals some of Defendants' misconduct.**

**152.**    Since the day that Mr. Lewis learned he was suspected of involvement with the Turner-Fields murders, he steadfastly maintained his innocence and attempted to clear his name.

**153.**    Just days after his conviction, Mr. Lewis contacted the FBI to report that Raucci had framed him for the murders.

**154.**    The very next day, the FBI interviewed Mr. Lewis at a correctional center. Mr. Lewis informed the FBI that Raucci was a corrupt police officer, was a partner of Frank Parise, had framed Mr. Lewis for the double-homicide because he refused to take over Mr. Parise's operation, and subsequently owed him a drug debt.

**155.**    Based on Mr. Lewis's information, the FBI opened a two-pronged investigation into: (1)

32

whether "Raucci was a corrupt police officer," and (2) whether Raucci had "'set up' Lewis and Morant for the double homicide of Turner and Fields."

**156.**    Upon information and belief, the FBI would not have promptly initiated such an investigation if it did not intersect with an ongoing FBI investigation into Mr. Parise and/or corruption within the NHPD.

**157.**    Over the course of its investigation, the FBI interviewed dozens of witnesses, conducted polygraphs, performed video surveillance, and undertook forensic and handwriting analyses.

**158.**    The FBI investigation continued for at least eighteen months.

**159.**    The FBI investigation largely corroborated Mr. Lewis's allegations—the FBI uncovered evidence that Raucci had illicit ties to Mr. Parise, that Raucci had a drug problem for a number of years, that his drug problem led him to associate with drug dealers, which likely influenced his police-work (including on the Turner-Fields investigation), and that officers and detectives in the NHPD had repeatedly witnessed him engage in misconduct. The FBI administered a polygraph examination to Mr. Lewis and determined he was *truthful* in his denial of any involvement with the murders. The FBI also administered a polygraph examination to Mr. Parise and determined he was *untruthful* when he denied setting someone up for a double murder.

**160.**    The FBI also took statements from a number of witnesses who stated that Raucci had coerced them and fed them information in order to make false statements implicating Mr. Lewis.

**161.**    For example, the FBI interviewed Ruiz. After informing Ruiz that Mr. Parise was in prison and Raucci was no longer a police officer, Ruiz broke down crying and explained that he had lied when he had implicated Mr. Lewis, and that Raucci had used him to set up Mr. Lewis.

**162.**    Despite Mr. Lewis's best efforts at post-conviction relief (often proceeding *pro se*), Mr. Lewis was unsuccessful in his attempts to overturn his convictions in state court.

**163.**     Shortly after the FBI investigation began, but before Mr. Lewis was sentenced, NHPD

Chief of Police Pastore came to see Mr. Lewis. Mr. Lewis told Pastore, in substance, that he was

innocent and that Raucci was a corrupt officer who was involved with Frank Parise and engaged

in misconduct on Parise's behalf. Pastore, however, told Mr. Lewis that he stood by Raucci.

**164.**     Upon information and belief, Pastore did nothing to investigate Mr. Lewis's information.

**165.**     In response to the evidence gathered by the FBI, Connecticut Congresswoman Rosa

DeLauro and New Haven Mayor John DeStefano, Jr. made inquiries on Mr. Lewis's behalf.

**166.**     Mayor DeStefano directed the Corporation Counsel to review a range of materials

relating to the case, and the Corporation Counsel advised the mayor that "the evidence unearthed

by the FBI raise[d] substantial doubt as to whether the New Haven Police investigation [wa]s

untainted." The Corporation Counsel advised the Mayor that "it would be prudent to re-open the

investigation with the evidence unearthed by the FBI in mind to determine whether the Police

Department is persuaded that Detective Raucci's role in the Turner/Fields investigation did or

did not create a situation in which an individual is inappropriately incarcerated for murder."

**167.**     On May 12, 1999, the Mayor formally requested that the NHPD reopen the investigation

into the Turner-Fields murders.

**168.**     Ultimately, NHPD Chief Melvin H. Wearing, in conjunction with the State's Attorney's

Office, declined to reopen the investigation into the Turner-Fields murders. The United States

Attorney's Office for the District of Connecticut also declined to indict Raucci on any charges.

**After nearly two decades of incarceration, Mr. Lewis is exonerated and released.**

**169.**     In or around 1999, Defendant Sweeney came forward and admitted what actually

occurred the night of Ruiz's first statement implicating Mr. Lewis. *See supra* ¶¶ 59–70

(discussing Ruiz's initial denials and Raucci's misconduct).

**170.**     Sweeney eventually testified at Mr. Morant's post-conviction proceedings (and again during Mr. Lewis's federal habeas), that Ruiz had repeatedly denied any personal knowledge of the murders. Sweeney also testified that Raucci had engaged in inappropriate interrogation techniques, including coaching Ruiz and promising leniency on the unrelated gang shooting if he made a statement against Mr. Lewis. This information was not disclosed to Mr. Lewis by the time of Mr. Lewis's trial or conviction.

**171.**     Even with this evidence, however, it took nearly another 15 years for Mr. Lewis to successfully obtain habeas relief.

**172.**     Based in part on Sweeney's information, Mr. Lewis filed a federal habeas petition in the District of Connecticut, arguing that he was actually innocent and that the State denied his right to a fair trial when it withheld *Brady* material during his trial.

**173.**     On December 16, 2013, U.S. District Judge Charles S. Haight, Jr. granted Mr. Lewis's petition for habeas relief. *Lewis v. Comm'r of Corr.*, 975 F. Supp. 2d 169 (D. Conn. 2013).

**174.**     On February 14, 2014, the parties submitted a joint motion to release Mr. Lewis from custody pending the State's appeal of the habeas decision. On February 26, 2014, the district court signed a writ ordering Mr. Lewis's release.

**175.**     On May 14, 2015, the U.S. Court of Appeals for the Second Circuit affirmed the district court's decision to grant Mr. Lewis's habeas petition. The Second Circuit determined that the State "never disclosed to Lewis or to defense counsel either prior to or during trial that Raucci had coached Ruiz on the testimony he ultimately gave at trial, that Ruiz was parroting what Raucci told him, or that he was doing so because Raucci said he would let him go." *Lewis v. Connecticut Com'r of Correction*, 790 F.3d 109, 122 (2d Cir. 2015).

**176.**     On May 28, 2015, the Connecticut Chief State's Attorney's Office informed Mr. Lewis's

habeas counsel that the State had "decided not to pursue this matter further."

177.     On July 17, 2015, Mr. Lewis, through counsel, filed a motion to dismiss all charges before the Connecticut Superior Court, Judicial District of New Haven. The Court granted the motion and dismissed all charges against Mr. Lewis on August 5, 2015.

178.     In connection with Mr. Morant's proceedings, the New Haven State's Attorney Michael Dearington acknowledged that "the key witness in this case [Ruiz] was not honest in his testimony with respect to both trials [Mr. Lewis and Mr. Morant], and it's public information that a certain police officer involved in this [Raucci] had put him up to contriving a story."

## DAMAGES

179.     The unlawful, intentional, willful, deliberately indifferent, reckless, and/or bad-faith acts and omissions of the Individual Defendants and the City of New Haven caused Scott Lewis to be falsely arrested and imprisoned, unfairly tried, wrongfully convicted, and forced to serve 19 years, 2 months, and 26 days, in jail and prison for a brutal crime he did not commit.

180.     As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, Mr. Lewis sustained injuries and damages, including loss of his freedom for more than nineteen years, loss of his youth, pain and suffering, severe mental anguish, emotional distress, indignities and embarrassment, degradation, permanent loss of natural psychological development, and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and freedom of speech and expression.

181.     As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, Mr. Lewis was also deprived of his familial

36

relationships, including relationship with his children.

182.    As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, Mr. Lewis sustained economic injuries and damages, including loss of income and loss of career opportunities.

183.    As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, Mr. Lewis sustained physical injuries and damages, including physical pain and suffering, personal injuries, physical illness, inadequate medical care, for which he is entitled to monetary relief.

## FEDERAL CLAIMS

### COUNT I
### 42 U.S.C. § 1983 Malicious Prosecution in Violation of the Fourth and Fourteenth Amendments

*Against Defendants Raucci, Maher, Sweeney, Pettola, and Lawlor*

184.    Plaintiff incorporates by reference all of the foregoing paragraphs and further alleges:

185.    Defendants Raucci, Maher, Sweeney, Pettola, and Lawlor, acting individually and in concert with malice and knowing that probable cause did not exist to prosecute Mr. Lewis for the Turner-Fields murders, caused Mr. Lewis to be arrested, charged, and prosecuted for those murders, thereby violating Mr. Lewis's clearly established right, under the Fourth and Fourteenth Amendments of the United States Constitution, to be free of prosecution absent probable cause.

186.    Specifically, as described in detail above, Defendants Raucci, Maher, Sweeney, Pettola, and Lawlor, acting individually and in concert, fabricated evidence and intentionally withheld and misrepresented exculpatory facts that they knew vitiated probable cause against Mr. Lewis and they knew would have impeached witnesses for the prosecution at trial, including but not limited to the fact that the supposedly inculpatory statements of Ovil Ruiz, Jose Roque, Stefon

Morant, and others were obtained by coercion, were completely false, and were fabricated.

**187.**    These Defendants also failed to conduct a constitutionally adequate investigation in light of evidence pointing to other suspects and away from Mr. Lewis.

**188.**    These Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Lewis' clearly established constitutional rights.  No reasonable officer in 1990 or 1991 would have believed this conduct was lawful.

**189.**    Mr. Lewis is completely innocent of the murders of Mr. Turner and Mr. Fields.

**190.**    The prosecution finally terminated in Mr. Lewis's favor on August 5, 2015, when all charges against him were dismissed.

**191.**    The acts and omissions by these Defendants described in the preceding paragraphs were the direct and proximate cause of Mr. Lewis's injuries because these Defendants knew, or should have known, that their conduct would result in the wrongful arrest, prosecution, conviction, and incarceration of Mr. Lewis.

## <u>COUNT II</u>
### 42 U.S.C. § 1983 Deprivation of Liberty without Due Process of Law and Denial of a Fair Trial by Fabricating Evidence, Withholding Material Exculpatory and Impeachment Evidence, and Deliberately Failing to Conduct a Constitutionally Adequate Investigation

*Against Defendants Raucci, Maher, Sweeney, Pettola, and Lawlor*

**192.**    Plaintiff incorporates by reference all of the foregoing paragraphs and further alleges:

**193.**    Defendants Raucci, Maher, Sweeney, Pettola, and Lawlor acting individually and in concert, and within the scope of their employment with the NHPD, deprived Mr. Lewis of his clearly established constitutional right to due process of law and to a fair trial.

**194.**    These Defendants deprived Mr. Lewis of his right to a fair trial by fabricating inculpatory evidence and deliberately using coercion and/or direct suggestion to obtain inculpatory witness

statements, including without limitation: fabricating the false statements of Ruiz, Roque, Morant, and other witnesses; and fabricating the letter purporting to threaten Ruiz.

195.    These Defendants deprived Mr. Lewis of his right to a fair trial by withholding material exculpatory and impeachment evidence from prosecutors and defense, including without limitation, handwritten notes and/or information regarding Ruiz's, Roque's, and Morant's actual statements prior to Defendants' coercion and fabrication of their false statements—that these witnesses knew nothing about the murders and had no information implicating Mr. Lewis.

196.    These Defendants deprived Mr. Lewis of his right to a fair trial by deliberately failing to conduct a constitutionally adequate investigation, including without limitation by failing to search the house in which Cardwell admitted he was storing the murder weapon and by failing to conduct a photo identification procedure with the witness who years later would identify Cardwell as the man standing on the street just prior to the murders.

197.    These Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Lewis's clearly established constitutional rights.  No reasonable officer in 1990 or 1991 would have believed this conduct was lawful.

198.    Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Lewis's injuries. Defendants knew, or should have known, that their conduct would result in Mr. Lewis's wrongful arrest, prosecution, conviction, and incarceration.

## COUNT III
### 42  U.S.C. § 1983 Civil Rights Conspiracy

*Against Defendants Raucci, Maher, Sweeney, Pettola, and Lawlor*

199.    Plaintiff incorporates by reference all of the foregoing paragraphs and further alleges:

200.    Defendants Raucci, Maher, Sweeney, Pettola, and Lawlor acting within the scope of their

employment and under color of state law, agreed among themselves and with other individuals, including Frank Parise and Ovil Ruiz, to act in concert in order to deprive Mr. Lewis of his clearly established Fourth and Fourteenth Amendment rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, and deprivation of liberty without due process of law, and to a fair trial.

201.    In furtherance of the conspiracy, Defendants engaged in and facilitated numerous overt acts, including, without limitation, the following:

    **a.**  Fabricating inculpatory evidence in reports and tapes of false and coerced witness statements;

    **b.**  Intentionally or with deliberate indifference failing to comply with their duty to disclose *Brady* material during the pendency of the case;

    **c.**  Fabricating the Ruiz letter in an attempt to explain Ruiz's changing statements;

    **d.**  Wrongfully prosecuting Mr. Lewis, knowing that they lacked probable cause; and

    **e.**  Committing perjury during hearings and trials.

202.    Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Lewis's injuries. Defendants knew, or should have known, that their conduct would result in Mr. Lewis's wrongful arrest, prosecution, conviction, and incarceration.

## <u>COUNT IV</u>
### 42 U.S.C. § 1983 Failure to Intercede

*Against Defendants Maher, Sweeney, Pettola, and Lawlor*

203.    Plaintiff incorporates by reference all of the foregoing paragraphs and further alleges:

204.    By their conduct and under color of state law, Defendants Maher, Sweeney, Pettola, and Lawlor, acting within the scope of their employment with the NHPD, had opportunities to intercede on behalf of Mr. Lewis to prevent his false arrest, malicious prosecution, false

imprisonment, and deprivation of liberty without due process of law, but, due to their intentional/reckless conduct and/or deliberate indifference, declined or refused to do so.

205.     These Defendants' failures to intercede violated Mr. Lewis's clearly established constitutional right to be free from unreasonable search and seizure and not to be deprived of liberty without due process of law as guaranteed by the Fourth and Fourteenth Amendments.  No reasonable police officer in 1990 or 1991 would have believed that failing to intercede to prevent these Defendants from coercing and fabricating inculpatory evidence, using coercion and/or direct suggestion to obtain false witness statements, withholding material exculpatory and/or impeachment evidence, deliberately failing to conduct a constitutionally adequate investigation, and causing Mr. Lewis to be arrested and prosecuted without probable cause, were lawful.

206.     Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Lewis's injuries. Defendants knew, or should have known, that their conduct would result in Mr. Lewis's wrongful arrest, prosecution, conviction, and incarceration.

## <u>COUNT V</u>
## 42 U.S.C. § 1983 Supervisory Liability Claim

*Against Defendants Sweeney, Pettola, Lawlor and Pastore*

207.     Plaintiff incorporates by reference all of the foregoing paragraphs and further alleges:

208.     Defendant Raucci and Maher acted with impunity in an environment in which they were not adequately trained, supervised, or disciplined by Defendants Sweeney, Pettola, Lawlor, and Pastore, in this case and as a matter of practice.

209.     Defendants Sweeney, Pettola, Lawlor, and Pastore acted with gross negligence, recklessness, and/or deliberate indifference to Mr. Lewis's constitutional rights by failing to adequately train, supervise, and discipline detectives Raucci and Maher, and thereby allowing these detectives to deprive Mr. Lewis of his clearly established constitutional rights, including

his rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, and deprivation of liberty without due process of law, and to a fair trial.

210.    Had Defendants Sweeney, Pettola, Lawlor, and Pastore not provided grossly inadequate training, supervision, and discipline of Raucci and Maher, these defendants would not have coerced and fabricated witness statements against Mr. Lewis, fabricated other inculpatory evidence, committed perjury, withheld exculpatory and impeachment evidence, and intentionally and maliciously caused Mr. Lewis to be arrested and prosecuted without probable cause.

211.    Defendants Sweeney, Pettola, Lawlor, and Pastore were involved in the investigation of Mr. Lewis and directly supervised the investigative acts taken by Raucci and Maher.

212.    The grossly negligent, reckless, and/or deliberately indifferent conduct of Defendants Sweeney, Pettola, Lawlor, and Pastore violated their clearly established duty, in 1991, to supervise Raucci and Maher, and no reasonable police supervisor in 1991 would have believed that grossly negligent, reckless, and/or deliberately indifferent supervision in the face of actual or constructive notice of misconduct by their subordinate officers was lawful.

213.    Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Lewis's injuries. Defendants knew, or should have known, that their conduct would result in Mr. Lewis's wrongful arrest, prosecution, conviction, and incarceration.

<u>COUNT VI</u>
**42 U.S.C. § 1983 Municipal Liability Claim**

*Against Defendant Pastore, in his official capacity, and Defendant City of New Haven*

214.    Plaintiff incorporates by reference all of the foregoing paragraphs and further alleges:

**Municipal liability based on Chief Pastore's ratification of and/or deliberate indifference to Raucci's misconduct.**

215.    Defendant Pastore served as the Chief of Police of the NHPD from before the Turner-

Fields murders, until well after Mr. Lewis's wrongful conviction.

216.     As Chief of Police, Pastore had ultimate decision making authority with respect to the

NHPD's personnel decisions (such as which officers and detectives were assigned to which unit

and which cases), disciplinary issues (such as when to initiate an internal investigation into an

allegation of misconduct), and investigative steps (such as whether to open or close particular

investigations).

217.     Although Chief Pastore was aware of Raucci's misconduct—including both investigative

misconduct and his illicit association with known criminals—prior to Mr. Lewis's wrongful

conviction, Pastore chose not to investigate information that Pastore received indicating that

Raucci had framed Mr. Lewis. In fact, Pastore did absolutely nothing to question Raucci's

investigation into the Turner-Fields murders and did not even discipline Raucci until *after* Mr.

Lewis was wrongfully convicted.

**Municipal liability based on the NHPD's custom, pattern, or practice of unconstitutional**
**investigative techniques.**

218.     Prior to and at the time of this unlawful investigation, prosecution, and conviction, NHPD

officers and detectives, including Defendant Raucci, maintained a custom, pattern, or practice of

unconstitutional investigative techniques, including but not limited to the following:

   **a.**   the use of coercive and/or suggestive techniques in interviews and interrogations to

           obtain witness statements that law enforcement knew or should have known were

           false;

   **b.**   the fabrication of inculpatory evidence, including witness statements;

   **c.**   the suppression of exculpatory and/or impeachment evidence;

   **d.**   the intentional failure to conduct adequate investigations of crimes; and

   **e.**   engaging in the affirmative concealment and cover up of this type of misconduct.

219.     The policy, custom, pattern, or practice of unconstitutional investigative techniques by NHPD detectives and officers is reflected in the multiple acts of misconduct and illegality committed by Defendant Raucci and multiple NHPD detectives and supervisors in relation to multiple witnesses, both in Mr. Lewis's case and other unrelated cases as detailed above.

**<u>Municipal Liability based on the NHPD's failure to supervise, discipline, and train its officers and detectives with respect to unconstitutional investigative techniques</u>.**

220.     Prior to and at the time of the unlawful investigation, prosecution, and conviction of Mr. Lewis, the NHPD, by and through its final policymakers, maintained a policy, custom, or pattern and practice of failing to adequately supervise, discipline, and train NHPD officers and detectives, including Detective Raucci, with respect to their use of unconstitutional investigative techniques, including but not limited to using police informants, conducting custodial interrogations and witness interviews, documenting and disclosing exculpatory and impeachment evidence to prosecutors, and the affirmative ongoing obligation to come forward with exonerating evidence.

221.     The NHPD's policy, custom, pattern, or practice of failing to adequately supervise, discipline, and train NHPD officers and detectives with regard to their use of unconstitutional investigative techniques is reflected in the numerous acts of misconduct and illegality committed by Defendant Raucci and other NHPD detectives and supervisors, both in Mr. Lewis's case and other unrelated cases, and the fact that these officers and detectives were permitted to continue to engage in such misconduct with impunity.

222.     Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Lewis's injuries. Defendants knew, or should have known, that their conduct would result in Mr. Lewis's wrongful arrest, prosecution, conviction, and incarceration.

### STATE LAW CLAIMS

### COUNT VII
**Malicious Prosecution, in Violation of Connecticut State Law**

*Against Defendants Raucci, Maher, Sweeney, Pettola, and Lawlor*

223.    Plaintiff incorporates by reference all of the foregoing paragraphs and further alleges:

224.    Defendants Raucci, Maher, Sweeney, Pettola, and Lawlor, acting individually and in concert and within the scope of their employment with the NHPD, with malice and knowing that probable cause did not exist to prosecute Mr. Lewis for the Turner-Fields murders, caused Mr. Lewis to be arrested, charged, and prosecuted for those murders, thereby violating Mr. Lewis's clearly established right, under the Fourth and Fourteenth Amendments of the United States Constitution, to be free of prosecution absent probable cause.

225.    Specifically, as described in detail above, Defendants Raucci, Maher, Sweeney, Pettola, and Lawlor, acting individually and in concert, fabricated evidence and intentionally withheld and misrepresented exculpatory facts that they knew vitiated probable cause against Mr. Lewis and they knew would have impeached witnesses for the prosecution at trial, including but not limited to the fact that the supposedly inculpatory statements of Ovil Ruiz, Jose Roque, Stefon Morant, and others were obtained by coercion, were completely false, and were fabricated.

226.    These Defendants also failed to conduct a constitutionally adequate investigation in light of evidence pointing to other suspects and away from Mr. Lewis.

227.    These Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Lewis' clearly established constitutional rights.  No reasonable officer in 1990 or 1991 would have believed this conduct was lawful.

228.    Mr. Lewis is completely innocent of the murders of Mr. Turner and Mr. Fields. The

prosecution finally terminated in Mr. Lewis's favor on August 5, 2015, when all charges against him were dismissed.

229.    Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Lewis's injuries. Defendants knew, or should have known, that their conduct would result in Mr. Lewis's wrongful arrest, prosecution, conviction, and incarceration.

<u>COUNT VIII</u>
**Abuse of Process, in Violation of Connecticut State Law**

*Against Defendants Raucci, Maher, Sweeney, Pettola, and Lawlor*

230.    Plaintiff incorporates by reference all of the foregoing paragraphs and further alleges:

231.    Defendants Raucci, Maher, Sweeney, Pettola, and Lawlor, acting individually and in concert with improper purpose and without legal justification, and within the scope of their employment with the NHPD, caused Mr. Lewis to be arrested, charged, and prosecuted for the Turner-Fields murders knowing that the evidence against him was false and fabricated.

232.    As described in detail above, after commencement of legal proceedings, Defendants Raucci, Maher, Sweeney, Pettola, and Lawlor, fabricated evidence and intentionally withheld and misrepresented exculpatory facts that they knew vitiated probable cause against Mr. Lewis and they knew would have impeached witnesses for the prosecution at trial, including but not limited to the fact that the supposedly inculpatory statements of Ovil Ruiz, Jose Roque, Stefon Morant, and others were obtained by coercion, were completely false, and were fabricated.

233.    Defendants had no legal justification or proper purpose for their actions. Defendant Raucci, for example, fabricated evidence on behalf of Mr. Frank Parise, whom he knew to be involved in criminal activity. The remaining Defendants similarly followed Raucci's illicit lead.

234.    These Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Lewis'

clearly established constitutional rights.  No reasonable officer in 1990 or 1991 would have believed this conduct was lawful.

235.   Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Lewis's injuries. Defendants knew, or should have known, that their conduct would result in Mr. Lewis's wrongful arrest, prosecution, conviction, and incarceration.

**COUNT IX**
**Intentional or Negligent Infliction of Emotional Distress,**
**in Violation of Connecticut State Law**

*Against Defendants Raucci, Maher, Sweeney, Pettola, and Lawlor*

236.   Plaintiff incorporates by reference all of the foregoing paragraphs and further alleges:

237.   Defendants Raucci, Maher, Sweeney, Pettola, and Lawlor, acting individually and in concert with improper purpose and without legal justification, and within the scope of their employment with the NHPD, caused Mr. Lewis to be arrested, charged, and prosecuted for the Turner-Fields murders knowing that the evidence against him was false and fabricated.

238.   The misconduct by these Defendants, as described throughout this Complaint, constituted fraudulent, dishonest, and corrupt means of obtaining the arrest, prosecution, conviction and confinement of Mr. Lewis for the Turner-Fields murders.

239.   These acts and omissions were undertaken with malice, and resulted in the intentional and unlawful arrest, prosecution, conviction, restraint and confinement of Mr. Lewis.

240.   These Defendants, acting within the scope of their employment and under color of state law, took these actions with the purpose of inflicting emotional distress upon Mr. Lewis. These Defendants knew or should have known that their actions would likely result in inflicting emotional distress on Mr. Lewis.

241.   The conduct of these Defendants was extreme and outrageous, resulting in Mr. Lewis

serving more than 19 years in prison for a crime that he did not commit.

**242.**    Defendants' conduct was the direct and proximate cause of Mr. Lewis's extreme and severe emotional distress occasioned by his suffering severe mental anguish including, but not limited to humiliation, indignities, embarrassment, degradation, and other damages.

### COUNT X
### Negligence, in Violation of Connecticut State Law

*Against Defendants Raucci, Maher, Sweeney, Pettola, Lawlor, and Pastore*

**243.**    Plaintiff incorporates by reference all of the foregoing paragraphs and further alleges:

**244.**    Defendants Raucci, Maher, Sweeney, Pettola, Lawlor, and Pastore were police personnel acting within the scope of their employment and under color of law, who had a duty to Mr. Lewis, and citizens in general, to diligently, fairly, and accurately investigate crimes and arrest persons only when there was probable cause to do so. These Defendants also had a duty to Mr. Lewis, and citizens in general, to protect them from the unlawful or grossly negligent conduct of other NHPD officers and detectives.

**245.**    These Defendants, however, breached their duties by causing Mr. Lewis to be wrongfully arrested, charged, prosecuted, convicted, and incarcerated for the Turner-Fields murders, when they knew, or reasonably should have known, that the evidence against Mr. Lewis was fabricated and that there was no probable cause to believe he was guilty.

**246.**    These Defendants breached their duties to Mr. Lewis by coercing witnesses, fabricating evidence, intentionally withholding and misrepresenting exculpatory evidence, failing to adequately and properly investigate the murders, failing to properly protect Mr. Lewis from the unlawful or grossly negligent conduct of other NHPD officers and detectives.

**247.**    Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Lewis's injuries. Defendants knew, or should have known, that their

conduct would result in Mr. Lewis's wrongful arrest, prosecution, conviction, and incarceration.

## COUNT XI
### Violation of Article First, §§ 7, 8, and 9 of the Connecticut Constitution

*Against Defendants Raucci, Maher, Sweeney, Pettola, and Lawlor*

**248.**   Plaintiff incorporates by reference all of the foregoing paragraphs and further alleges:

**249.**   Defendants Raucci, Maher, Sweeney, Pettola, and Lawlor, acting individually and in concert, and within the scope of their employment with the NHPD, caused Mr. Lewis to be wrongfully arrested, charged, prosecuted, convicted, and incarcerated for the Turner-Fields murders. Specifically, as described in detail above, these Defendants coerced witnesses, fabricated evidence, intentionally withheld and misrepresented exculpatory facts that they knew vitiated probable cause against Mr. Lewis, failed to conduct a constitutionally adequate investigation in light of evidence pointing to other suspects and away from Mr. Lewis, and wrongfully failed to protect Mr. Lewis from the unlawful or grossly negligent conduct of other NHPD officers and detectives.

**250.**   The intentional misconduct of these Defendants, acting within their employment and under color of state law, violated Mr. Lewis's clearly established rights under Sections 7, 8, and 9 of Article First of the Constitution of the State of Connecticut. No reasonable police officer would have believed that these acts were lawful or that probable cause existed.

**251.**   Mr. Lewis is completely innocent of the murders of Mr. Turner and Mr. Fields. The criminal prosecution finally terminated in Mr. Lewis's favor on August 5, 2015, when all charges against him were dismissed.

**252.**   Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Lewis's injuries. Defendants knew, or should have known, that their conduct would result in Mr. Lewis's wrongful arrest, prosecution, conviction, and incarceration.

## COUNT XII
## Indemnification under Conn. Gen. Stat. §7-465

*Against the City of New Haven*

**253.**   Plaintiff incorporates by reference all of the foregoing paragraphs and further alleges:

**254.**   As described in the preceding paragraphs and Counts, the Individual Defendants Raucci, Maher, Sweeney, Pettola, Lawlor, and Pastore were police personnel acting within the scope of their employment and under color of law, who had a duty to Mr. Lewis, and citizens in general, to diligently, fairly, and accurately investigate crimes and arrest persons only when there was probable cause to do so, and to protect them from the unlawful or grossly negligent conduct of other NHPD officers and detectives. As discussed above, the Individual Defendants breached these duties in a number of ways, thereby directly and proximately causing Mr. Lewis's wrongful arrest, prosecution, conviction, and incarceration.

**255.**   To the extent the Individual Defendants are determined to be liable to Mr. Lewis and are obligated to pay damages, the Defendant City of New Haven is liable to pay any such damages on behalf of the Individual Defendants pursuant to the City of New Haven's statutory liability imposed by Conn. Gen. Stat. §7-465.

## COUNT XIII
## Direct action under Conn. Gen. Stat. § 52-557n

*Against the City of New Haven*

**256.**   Plaintiff incorporates by reference all of the foregoing paragraphs and further alleges:

**257.**   The Individual Defendants Raucci, Maher, Sweeney, Pettola, Lawlor, and Pastore were police personnel acting within the scope of their employment and under color of law, who had a duty to Mr. Lewis, and citizens in general, to diligently, fairly, and accurately investigate crimes and arrest persons only when there was probable cause to do so, and to protect them from the

unlawful or grossly negligent conduct of other NHPD officers and detectives. As discussed above, the Individual Defendants breached these duties in a number of ways, thereby directly and proximately causing Mr. Lewis's wrongful arrest, prosecution, conviction, and incarceration.

**258.**   Pursuant to the City of New Haven's statutory liability imposed by Conn. Gen. Stat. § 52-557n, the City of New Haven is liable for the damages caused by the acts and omissions of these Individual Defendants.

**WHEREFORE**, Plaintiff Scott Lewis prays as follows:

A.   That the Court award compensatory damages to Plaintiff and against all Defendants, jointly and severally, in an amount to be determined at trial;

B.   That the Court award punitive damages to Plaintiff, and against all individual Defendants in their individual capacity, in an amount to be determined at trial, that will deter such conduct by defendants in the future;

C.   For a trial by jury;

D.   For pre-judgment and post-judgment interest and recovery of Plaintiff's costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

E.   For any and all other relief to which Plaintiff may be entitled.


**Dated: August 15, 2016**                    **Respectfully Submitted,**

                             /s/ Richard Emanuel

                            Richard Emanuel
                            Law Offices of Richard Emanuel
                            246 Goose Lane, Suite 106
                            Guilford, CT 06437
                            (203) 689-5761

                            Nick Brustin*
                            Emma Freudenberger*
                            Farhang Heydari*
                            Vishal Agraharkar*
                            Neufeld Scheck & Brustin, LLP
                            99 Hudson Street, Eighth Floor
                            New York, NY 10013
                            (212) 965-9081
                            *Attorneys not yet admitted to the District of
                            Connecticut; applications to practice
                            pro hac vice forthcoming.