**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| SCOTT T. LEWIS, | |
| Plaintiff, | |
| v. | **Case No. 3:16-cv-1382 (SRU)** |
| The CITY OF NEW HAVEN; Chief of Police NICHOLAS PASTORE, in his individual and official capacities; and Officers VINCENT RAUCCI, ROBERT LAWLOR, VAUGHN MAHER, JOSEPH PETTOLA, and MICHAEL SWEENEY, in their individual capacities; | **December 6, 2016** |
| Defendants. | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO**

**DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

I.  INTRODUCTION ............................................................................................................... 1

II.  STATEMENT OF FACTS ................................................................................................. 2

A.  The Turner and Fields murders. ................................................................................. 2

B.  Defendants fabricate and coerce witness statements falsely implicating Mr. Lewis in the Turner-Fields murders. ................................................................................................. 3

   1.  Witness #1: Ovil Ruiz ......................................................................................... 3

   2.  Witness #2: Jose Roque ...................................................................................... 3

   3.  Witness # 3: Stefon Morant ................................................................................ 4

C.  Defendants suppress the investigation of Michael Cardwell. ............................................. 4

D.  Chief Pastore knew of Raucci's history of criminal and official misconduct but did nothing to stop Mr. Lewis's prosecution. ............................................................................. 5

E.  The NHPD's unconstitutional pattern, practice, or custom of coercing, fabricating, and suppressing witness and suspect statements. ............................................................... 6

III.  MOTION TO DISMISS LEGAL STANDARD ................................................................ 7

IV.  ARGUMENT ..................................................................................................................... 8

A.  Lewis adequately pleaded Monell claims against the City of New Haven. .................... 8

   1.  The City had a longstanding pervasive policy, practice, or custom of conducting unconstitutional investigations of major crimes. ................................................... 8

      a. Lewis pleaded a pattern of state and federal court findings that NHPD investigations were unconstitutional. ................................................................................................. 9

      b. Lewis pleaded many examples of unconstitutional investigatory techniques used by various NHPD officers during the Turner-Fields investigation. ........................................ 11

   2.  The City is liable for failing to supervise and discipline NHPD personnel. ............... 13

   3.  Chief Pastore, the NHPD's final policymaker, permitted Raucci's tainted prosecution to proceed. ................................................................................................................. 15

B.  Raucci's misconduct occurred within the course and scope of his employment with the NHPD. .......................................................................................................................... 16

   1.  As a matter of law, Raucci's conduct falls within the course and scope of his employment so long as he was motivated in part to serve the NHPD. ............................ 17

   2.  In the alternative, the Court should delay its decision on course and scope until the parties have developed the factual record. ............................................................... 20

C.  Lewis's negligence causes of action should proceed against the City. ......................... 21

V.  CONCLUSION ................................................................................................................. 21

i

**TABLE OF AUTHORITIES**

## Cases

*A–G Foods, Inc. v. Pepperidge Farm, Inc.*, 579 A.2d 69 (Conn. 1990)........................... 20, 24, 25

*Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113 (2d Cir. 2004) ........................................ 9, 19

*Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162 (2d Cir. 2012) ........................................ 7

*Arista Records, LLC v. Doe 3*, 604 F.3d 110 (2d Cir. 2010) .................................................... 7, 8

*Belanger v. Village Pub I*, 26 Conn. App. 509 (1992).................................................................. 24

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) .................................................................. 7

*Cash v. Cnty. of Erie*, 654 F.3d 324 (2d Cir. 2011) ............................................................... 9, 17

*Cefaratti v. Aranow*, 141 A.3d 752 (Conn. 2016) ...................................................................... 22

*Colon v. City of New York*, 09-cv-8 (JBW) 2009 WL 4263362 (E.D.N.Y. Nov. 25, 2009) .. 13, 16

*Doe v. Norwich Roman Catholic Diocesan Corp.*, 309 F. Supp. 2d 247 (D. Conn. 2004) .......... 25

*Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83 (2d Cir. 2002) ........... 8

*Ferrari v. County of Suffolk*, 790 F. Supp. 2d 34 (E.D.N.Y. 2011)....................................... 11, 12

*Fiacco v. City of Rensselaer*, 783 F.2d 319 (2d Cir. 1986) ......................................................... 18

*Fountain v. Karim*, 838 F.3d 129 (2d Cir. 2016)........................................................................ 25

*Gibbs v. City of New York*, 714 F. Supp. 2d 419 (E.D.N.Y. 2010)............................................. 23

*Gonzalez v. Waterbury Police Dep't*, 12-cv-478 (SRU), 2016 WL 953211 (D. Conn. Mar. 11,

     2016) ...................................................................................................................................... 16

*Goode v. Newton*, 12-cv-754 (JBA), 2013 WL 1087549 (D. Conn. Mar. 14, 2013)............. 11, 18

*Gutierrez v. Thorne*, 13 Conn. App. 493 (1988)......................................................................... 21

*Harp v. King*, 835 A.2d 953 (2003) ........................................................................ 21, 22, 24

*Hunter v. City of New York*, 35 F. Supp. 3d 310 (E.D.N.Y. 2014)............................................. 12

*Jeffes v. Barnes*, 208 F.3d 49 (2d Cir. 2000) ............................................................. 19

*Keiler v. Harlequin Enters. Ltd.*, 751 F.3d 64 (2d Cir. 2014)....................................... 8

*Kilduff v. Cosential, Inc.*, 289 F. Supp. 2d 12 (D. Conn 2003)..................................... 25

*Loza v. Lynch*, 625 F. Supp. 850 (D. Conn. 1986) ...................................................... 11

*Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 989 F. Supp. 110 (D. Conn. 1997) . 24, 25

*Monell v. Department of Social Services*, 436 U.S. 658 (1978) .................................... 8

*Morillo v. City of New York*, 95-cv-2176 (JSM), 1997 WL 72155 (S.D.N.Y. Feb. 20, 1997)..... 23

*Mullen v. Horton*, 46 Conn. App. 759 (1997)............................................................. 22

*Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415 (2d Cir. 2009)........................ 9

*Osterhoudt v. City of New York*, No. 10-cv-3173 (RJD) (RML), 2012 WL 4481927 (E.D.N.Y. Sept. 27, 2012) ................................................................................ 13

*Pelletier v. Bilbiles*, 227 A.2d 251 (Conn. 1967)......................................................... 22

*Reyes v. County of Suffolk*, 995 F. Supp. 2d 215 (E.D.N.Y. 2014) ............................... 13

*Safepath Sys. LLC v. N.Y.C. Dep't of Educ.*, 563 F. App'x 851 (2d Cir. 2014) ............................. 8

*Son v. Hartford Ice Cream Co.*, 129 A. 778 (Conn. 1925)............................................ 22

Tieman v. City of Newburgh, 13-cv-4178 (KMK), 2015 WL 1379652 (S.D.N.Y. Mar. 26, 2015 ..................................................................................... 15

*Tyus v. Newton*, 13-cv-1486 (SRU), 2015 WL 1471643 (D. Conn. Mar. 31, 2015)............. 11, 15

*Vann v. City of New York*, 72 F.3d 1040 (2d Cir. 1995).............................................. 17

*Waller v. City of Middletown*, 89 F. Supp. 3d 279 (D. Conn. 2015) ....................... 11, 18

*Wray v. City of New York*, 490 F.3d 189 (2d Cir. 2007)............................................. 16

**Statutes**

Conn. Gen. Stat. § 52-557n ................................................................................ 21

Conn. Gen. Stat. § 7-465 ................................................................................... 16

New Haven Municipal Code, Tit. I, Art. VI, Sec. 10(A), (B) ..................................... 16

## I.      INTRODUCTION

Plaintiff Scott Lewis spent over twenty years incarcerated for the 1990 double murder of Ricardo Turner and Lamont Fields—crimes he did not commit. Lewis repeatedly told officials at the New Haven Police Department ("NHPD"), the Mayor's Office, and the FBI that NHPD Detective Vincent Raucci and others had fabricated the evidence that convicted him. Lewis was right, but his pleas went unheard.

Finally, in 2013, after nearly two decades of litigation, Lewis was set free. Testimony from NHPD detectives and civilian witnesses had proven what Lewis had been saying all along: Raucci and others had fabricated evidence, coerced false witness statements, and suppressed or destroyed exculpatory evidence, including their own investigation of alternative suspects.

Raucci did not act alone. He had the support and assistance of five different officers, including supervisors and the Chief of Police Nicholas Pastore. And the multiple instances of misconduct that caused Lewis's conviction were not isolated acts; investigative misconduct had long been the norm at the NHPD. Before, during, and after Lewis's wrongful conviction and imprisonment, the NHPD had a custom, policy, and practice of using unconstitutional investigative techniques in major investigations. Multiple civil rights lawsuits, suppression hearings, FBI investigations, and internal NHPD investigations revealed widespread misconduct during the period of Lewis's prosecution, but nothing was done to prevent the foreseeable constitutional harm in this case. In fact, Chief of Police Nicholas Pastore knew about Raucci's history of misconduct and connections to organized crime but, consistent with NHPD custom and practice at the time, rather than disciplining Raucci, Pastore promoted him. Raucci was thus given free rein to conduct unconstitutional investigations and abuse his position for personal gain.

Defendants City of New Haven ("the City") and Chief Pastore (official capacity) do not dispute that Lewis has alleged actionable misconduct by the individual officers. In their motion to dismiss, these Defendants deny *only* municipal liability. But Lewis has not pleaded a boilerplate *Monell* case. He alleged the full participation of six police officers, including Chief Pastore, in a department where unconstitutional misconduct was rampant. Lewis plausibly alleged that the NHPD had an unofficial policy of conducting unconstitutional criminal investigations and that decisionmakers at the highest level tacitly endorsed this misconduct. He has also shown that the City is liable under Connecticut state law for the misconduct of its officers. The motion to dismiss should be denied in full.

## II.        STATEMENT OF FACTS

### A.        The Turner and Fields murders.

On October 11, 1990, Ricardo Turner and Lamont Fields were shot to death in their New Haven apartment. Compl. ¶¶ 21, 22. Lewis had never met Turner or Fields; his name was found nowhere among their personal effects; and he was not named during the initial investigation into their killings. *Id.* ¶ 29. Lewis was at work at the time of the murders, and DNA testing later excluded him as a source of *any* biological material found at the crime scene. *Id.* ¶¶ 24–25.

At the behest of Frank Parise, a known organized crime figure, Raucci framed Lewis for the murders. In 1990, Lewis was a part-time drug dealer in Parise's criminal organization. *Id.* ¶¶ 32–33, 35. Parise, who had been indicted on a federal weapons charge, asked Lewis to take a larger role in the organization, but Lewis refused, asking instead to leave the drug business. *Id.* ¶¶ 34, 37. Because of a drug debt and Lewis's refusal to take a larger role in his organization, Parise solicited his associate Raucci to frame Lewis for the Turner-Fields murders. *Id.* ¶¶ 39–43. When Raucci arrested Lewis for the murders, he told him: "You should have never stopped selling drugs in Fair Haven." *Id.* ¶ 44.

B.       **Defendants fabricate and coerce witness statements falsely implicating Mr. Lewis in the Turner-Fields murders.**

Raucci inserted himself into the ongoing investigation of the Turner-Fields murders and framed Lewis by fabricating evidence. *Id.* ¶ 45. But Raucci did not act alone. With the assistance or acquiescence of five officers, including the Chief of Police himself, Raucci coerced fabricated statements out of three witnesses who knew nothing about the killings—Ovil Ruiz, Jose Roque, and Stefon Morant. *Id.* ¶ 46. Raucci used the same unconstitutional investigative techniques to coerce each statement. *Id.*

1.       *Witness #1: Ovil Ruiz*

When Raucci first interviewed Ruiz, Ruiz denied knowing anything about the murders. *Id.* But, after Raucci threatened him with life imprisonment on an unrelated case and fed him details about the murders, Ruiz falsely stated that Lewis and Turner were lovers and that he heard Lewis confessing to killing Turner and Fields. *Id.* ¶¶ 51−53. Raucci conducted his interrogation in the presence of his supervisor, Defendant Sgt. Michael Sweeney, who never documented or disclosed to prosecutors the fact that Ruiz's statement was false. *Id.* ¶¶ 60, 62. Defendant Det. Joseph Pettola was also present for key pieces of Ruiz's interrogation; he too never disclosed Raucci's misconduct or revealed that Ruiz's statement was false. *Id.* ¶¶ 64−66. Defendant Sgt. Robert Lawlor, another supervisor, was told about the coercion of Ruiz's false statement. *Id.* ¶¶ 67−68. Although Lawlor later told the FBI that Raucci's investigation had been "troublesome," like Sweeney and Pettola, he did nothing to halt Lewis's wrongful prosecution. *Id.* ¶ 69−70.

2.       *Witness #2: Jose Roque*

Defendant Det. Vaughn Maher, the original lead detective on the Turner-Fields murders, helped Raucci to coerce Roque's false statement. *Id.* ¶ 71. Raucci and Maher told Roque that

they would arrest him for the Turner-Fields murders unless he gave a false statement implicating Lewis. *Id.* ¶ 73. They fed him details of the murders which he regurgitated during a taped statement. *Id.* ¶ 74. Roque claimed to have seen Lewis throw a .357 revolver from a bridge into a river—which never happened. *Id.* ¶ 75. Raucci and Maher never told prosecutors that Roque's testimony was false or coerced or that they fed him any details about the crimes. *Id.* ¶¶ 74, 78. During Lewis's trial, Roque testified that Raucci and Maher repeatedly stopped the tape recording to feed him facts—a detail corroborated by a later FBI investigation revealing that the tape had been stopped 11 times. *Id.* ¶¶ 78–80.

### 3. *Witness # 3: Stefon Morant*

Raucci and Maher also coerced Morant into falsely implicating Lewis. *Id.* ¶ 84. Although Morant initially denied having any involvement or knowledge of the murders, Raucci and Maher threatened him with arrest and interrogated him for hours. *Id.* ¶¶ 82, 84. They coerced Morant into making a fabricated statement that he had driven Lewis to Turner's apartment, that Lewis went into the building alone and later came running out, that Lewis confessed to the killings, and that he saw Lewis throw a gun into the river. *Id.* ¶¶ 82, 84. Morant immediately retracted his statement and refused to sign it. In retaliation, he was charged with the murders and ultimately convicted. *Id.* ¶ 87. (Although maintaining his innocence at trial, Morant took a plea bargain for time served.)

### C. **Defendants suppress the investigation of Michael Cardwell.**

Before Raucci inserted himself into the investigation, Maher had uncovered significant evidence that a drug dealer named Michael Cardwell had killed Turner and Fields. *Id.* ¶ 90. Despite knowing that Cardwell was an associate of the victims and that *two* known and reliable informants had reported that Cardwell *confessed* to the killings, Maher and Raucci deliberately failed to pursue their investigation of Cardwell, falsely making it appear as if this lead had been

4

exhausted. *Id.* ¶¶ 91–98. In 2005, an eyewitness identified Cardwell from a line-up as the person

she saw outside Turner's apartment immediately before the murders. *Id.* ¶ 99.

### D.   Chief Pastore knew of Raucci's history of criminal and official misconduct but did nothing to stop Mr. Lewis's prosecution.

Raucci's brazen misconduct was witnessed by and reported to his fellow detectives and

supervisors. Compl. ¶¶ 136; 143; 91–98; 82–84; 71; 60–66; 46. So too were Raucci's ongoing

dealings with Frank Parise, a known drug dealer with ties to organized crime. *Id.* at ¶¶ 133,

138–39. Before the Turner-Fields investigation, Raucci openly met with Parise for illegitimate

purposes, including in front of other officers. *Id.* ¶ 138. Raucci and Chief Pastore had a

particularly close relationship, and Pastore knew Raucci had a drug habit. *Id.* ¶¶ 145−46. A

civilian had reported Raucci's corruption directly to Pastore. ¶ 139. And Pastore and other

NHPD brass knew that Raucci's previous misconduct included coercing a false witness

statement during his investigation into the high-profile murder of Yale student Christian

Prince—within months of Raucci beginning to investigate the Turner and Fields murders.

*Id.* ¶ 141.

Yet Chief Pastore and other NHPD supervisors failed to take any action to adequately

supervise Raucci or to discipline him for his misconduct. Instead, Pastore promoted Raucci and

permitted him to lead high-profile investigations like the Turner-Fields investigation, which

Pastore knew Raucci was investigating. *Id.* ¶¶ 119, 134−35.

Pastore's tolerance for Raucci's misconduct continued during and after Scott Lewis's

prosecution. By early 1995, months before Mr. Lewis's trial and conviction, Raucci's reputation

for misconduct had escalated so sufficiently that the Internal Affairs Division of the NHPD

began investigating him. *Id.* ¶ 148. In May 1995, the month that Lewis was convicted, Defendant

Lawlor, who had been promoted to NHPD Head of Detectives, ordered officers to follow Raucci

and learned that he was spending hours at known drug locations in the middle of the night. *Id.*
¶ 147. While Pastore ordered Raucci to stay out of that area, he subsequently learned Raucci had
disregarded his order and moved next door to a drug house. *Id.* Just after Mr. Lewis's conviction,
Pastore learned that Raucci coerced a fabricated witness statement as the lead investigator of the
murder of Kevin "Goober" Brahan. *Id.* ¶ 142. NHPD's internal affairs officers and the FBI
conducted separate investigations into Raucci. *Id.* ¶¶ 144–46. Internal affairs investigators
learned that Raucci had struck a suspect in the face with the butt of a weapon and had lied about
it. *Id.* ¶ 144. Both NHPD investigators and the FBI determined that Raucci had a history of drug
abuse, and the FBI discovered that Pastore knew of his drug habit. *Id.* ¶¶ 145–46. Lewis *himself*
told Pastore that Raucci was a corrupt officer who had framed Lewis for murder. *Id.* ¶ 163.

Despite everything Pastore and other supervisors knew about Raucci's misconduct in this
and other cases, they did nothing to prevent Lewis's unconstitutional prosecution. *Id.* ¶ 8. In fact,
the NHPD ignored a 1999 directive from New Haven's mayor to reopen the Turner-Fields
investigation. *Id.* ¶ 167. The NHPD continued to fight Lewis's exoneration well into this decade.

**E.     The NHPD's unconstitutional pattern, practice, or custom of coercing,
        fabricating, and suppressing witness and suspect statements.**

In his complaint, Lewis identified at least ***nineteen*** instances of police misconduct
between 1981 and 1996 under circumstances similar to those he has alleged. *See infra* at
IV(A)(i). These examples show that his prosecution was far from an anomaly—police coercion
and destruction of evidence was widespread in the NHPD during this period. Indeed, the
Connecticut Appellate Court described the NHPD's practice of destroying taped witness
statements a "policy." Compl. ¶ 131(f). The Court can infer from Lewis's complaint that the
normal course of an NHPD investigation included coercing false statements, destroying or
suppressing exculpatory evidence, and lying about it.

### III.    MOTION TO DISMISS LEGAL STANDARD

A Rule 12(b)(6) motion must be denied if the complaint includes "enough facts to state a claim to relief that is plausible on its face," that is, enough factual allegations, taken as true, "to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007); *see also Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010). "[I]n determining whether a complaint states a claim that is plausible, the court is required to proceed '*on the assumption that all the [factual] allegations in the complaint are true*,' [e]ven if their truth seems doubtful." *Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) (quoting *Twombly*, 550 U.S. at 555). "Given that the plausibility requirement '*does not impose a probability* requirement at the pleading stage . . . a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely.'" *Id.* (quoting *Twombly*, 550 U.S. at 556).

The Court must construe the complaint liberally and accept all facts alleged on information and belief when they are "peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible," *Arista*, 604 F.3d at 120 (citations omitted); *see also Keiler v. Harlequin Enters. Ltd.*, 751 F.3d 64, 71 (2d Cir. 2014). Direct evidence of a defendant's intent, motive, or knowledge is rarely available to plaintiffs before discovery, and "[i]t is sufficient to allege facts from which [the relevant mental state] on the part of the defendants reasonably may be inferred." *Safepath Sys. LLC v. N.Y.C. Dep't of Educ.*, 563 F. App'x 851, 857 (2d Cir. 2014) (internal quotation marks omitted) (quoting *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 91 (2d Cir. 2002)).

# IV.    ARGUMENT

## A.  Lewis adequately pleaded *Monell* claims against the City of New Haven.

Under *Monell v. Department of Social Services*, 436 U.S. 658, 690 (1978), a City can be

held liable under § 1983 for violating a plaintiff's constitutional rights in a number of ways.

Lewis has adequately pleaded the City of New Haven's *Monell* liability under three distinct

theories: (1) the City's informal but pervasive and longstanding practice of tolerating the use of

unconstitutional investigative techniques in major investigations; (2) the City's custom, pattern

or practice of failing to supervise its detectives to prevent unconstitutional misconduct in serious

felony investigations; and (3) the actions and inactions of Chief Pastore, the City's final

policymaker with respect to the NHPD's supervision and discipline, in failing to discipline

Raucci for repeated misconduct, or at a minimum ensure that he was adequately supervised to

prevent misconduct. (The City's motion does not challenge, or even discuss, this last theory of

liability, and any argument against it has been forfeited.)

### 1.    *The City had a longstanding pervasive policy, practice, or custom of conducting unconstitutional investigations of major crimes.*

To state a *Monell* claim, a plaintiff must show that "the municipality itself caused or is

implicated in the constitutional violation." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113,

124–25 (2d Cir. 2004). A city is always liable when its official policy is unconstitutional, but it

can also be liable when a longstanding and pervasive *unofficial* policy results in constitutional

harm. In other words, a "city's policy of inaction in light of notice that its program will cause

constitutional violations is the functional equivalent of a decision by the city itself to violate the

Constitution." *Cash v. Cnty. of Erie*, 654 F.3d 324, 334 (2d Cir. 2011) (internal quotation marks

omitted). A plaintiff can hold a city accountable when (1) an action or inaction attributable to the

City, (2) taken with deliberate indifference to the risk that constitutional violations would result,

(3) caused the violations of plaintiff's rights. *See id.* at 333–34 ; *Amnesty Am.*, 361 F.3d at 124–

27; *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 439–40 (2d Cir. 2009).

Lewis's complaint alleges that, historically, NHPD investigations were steeped in

misconduct. Before, during, and after Lewis's prosecution, NHPD officers regularly coerced

false witness statements, destroyed evidence, and lied about their investigations. This misconduct

was not limited to the investigation of the Turner-Fields murders; it pervaded the department.

The City does not dispute that it can be held liable for its deliberate failure to correct

unconstitutional practices. Indeed, that principle is the core of *Monell* liability. Instead, the City

argues that Lewis has not provided *enough examples* of unconstitutional behavior to prove a

municipal custom or policy. But Lewis has pleaded at least 19 examples of the NHPD's

widespread practice of coercing false statements, suppressing or destroying exculpatory

evidence, and lying about the details of investigations. Lewis has told the story of a department

that conducts unconstitutional investigations from start to finish. Courts, including this one,

regularly deny motions to dismiss *Monell* claims that allege much less. *See, e.g., Tyus v. Newton*,

13-cv-1486 (SRU), 2015 WL 1471643, at *11 (D. Conn. Mar. 31, 2015); *Waller v. City of

Middletown*, 89 F. Supp. 3d 279, 286–87 (D. Conn. 2015); *Goode v. Newton*, 12-cv-754 (JBA),

2013 WL 1087549, at *6–8 (D. Conn. Mar. 14, 2013); *Loza v. Lynch*, 625 F. Supp. 850, 854 (D.

Conn. 1986); *Ferrari v. County of Suffolk*, 790 F. Supp. 2d 34, 46 (E.D.N.Y. 2011).

      a.      ***Lewis pleaded a pattern of state and federal court findings that
NHPD investigations were unconstitutional.***

A plaintiff can state a plausible claim of municipal liability by citing "cases or complaints

in state or federal court alleging similar misconduct against the same set of defendants." *Hunter

v. City of New York*, 35 F. Supp. 3d 310, 324 (E.D.N.Y. 2014). Lewis's complaint is replete with

instances of unconstitutional misconduct by NHPD officers:

- Lewis cited *eight* examples of cases where Connecticut courts ordered witness testimony suppressed because the NHPD unconstitutionally destroyed prior witness statements. Compl. ¶ 131 (citing cases).

- Lewis cited *three* examples of civil rights and malicious prosecution lawsuits against NHPD officers alleging witness coercion, perjury, suppression of evidence, or all three. *Id.* ¶¶ 120–122. At least two ended in jury verdicts against the police.

- Lewis cited *two* examples of criminal cases in which witnesses testified that NHPD coerced false testimony through force or threats of prosecution. *Id.* ¶¶ 123–24.

In addition to these, Lewis cited *six* miscellaneous examples of extraordinary police misconduct resulting in promotion, not punishment. *Id.* ¶¶ 125–30. For example, Chief Pastore promoted Billy White to the helm of the NHPD's Criminal Intelligence Section despite allegations that White beat a 13-year-old boy without justification. *Id.* ¶ 126. White later pleaded guilty to federal corruption charges for his illegal activities while a member of the NHPD's Narcotics Enforcement Unit. *Id.*

The City suggests that Lewis's examples are insufficient to plausibly allege a government policy, custom, or practice. But district courts regularly deny motions to dismiss where plaintiffs supported their claims with many fewer examples. *See, e.g.*, *Ferrari*, 790 F. Supp. 2d at 46, (three); *Reyes v. County of Suffolk,* 995 F. Supp. 2d 215, 231 (E.D.N.Y. 2014) (more than three); *Colon v. City of New York*, 09-cv-8 (JBW) 2009 WL 4263362, at *1 (E.D.N.Y. Nov. 25, 2009) (six).

The City also suggests the Court should disregard Lewis's examples where he has not pleaded an official finding of misconduct—a small percentage of the total. For example, Lewis provided *eight* instances where Connecticut courts suppressed evidence because of the NHPD's unconstitutional practice of destroying inconvenient witness statements. (Contrary to the City's argument, whether the underlying convictions could still be supported without the suppressed testimony says nothing about whether NHPD *violated the Constitution by destroying evidence*.)

But the Court should consider even those instances where Lewis has not yet been able to plead an official finding of misconduct because they suggest the need for further discovery. At the motion to dismiss stage, "it is hard to ignore" unproven allegations, "which suggest that the conduct complained of is not limited to the four corners" of the complaint. *Osterhoudt v. City of New York*, No. 10-cv-3173 (RJD) (RML), 2012 WL 4481927, at *1 (E.D.N.Y. Sept. 27, 2012). Lewis's complaint pinpointed the smoke; additional discovery will uncover the fire.

> **b.**   *Lewis pleaded many examples of unconstitutional investigatory techniques used by various NHPD officers during the Turner-Fields investigation.*

Lewis's complaint linked the widespread misconduct in the NHPD's other investigations to the misconduct that happened in this case. The City attempts to portray Raucci as a rogue officer acting alone. But that is not what Lewis alleged. In this investigation alone, Lewis alleged a series of unconstitutional misconduct—including unconstitutional misconduct in three separate witness interviews—by five different detectives and supervisors. Specifically, Lewis's complaint alleges:

- Defendant Raucci coerced Ruiz into giving a false statement implicating Lewis in the murders. Compl. ¶¶ 51–54.

- Defendant Sweeney was present during Raucci's coercive interrogations of Ruiz and implicitly condoned Raucci's unconstitutional interrogation tactics by failing to intervene. Ruiz recanted his statement in a separate interview with Sweeney, but Sweeney neither documented this recantation nor did anything to prevent Ruiz's false testimony from convicting Lewis. Compl. ¶¶ 60–63, 67.

- Defendant Pettola joined Raucci in his interrogation of Ruiz and did nothing to prevent Raucci from coercing a false statement or to prevent that statement from being used to convict Lewis. Compl. ¶ 66.

- According to Sweeney's testimony in post-conviction proceedings, Defendant Lawlor knew that Raucci had coerced a false statement from Ruiz and did nothing to prevent Lewis's prosecution. Lawlor admitted to FBI investigators that Raucci's investigation of Lewis had been "troublesome." Compl. ¶¶ 68–69.

- With Defendant Maher, Raucci also coerced Roque into giving a false statement

11

implicating Lewis. Maher personally signed Roque's statement as a witness. Maher and Raucci repeatedly stopped recording Roque's statement to feed him facts and lied about doing so. Compl. ¶¶ 71–78.

- Raucci and Maher also taped a false coerced statement from Morant, and, when Morant tried to retract his statement, charged him with murder. Compl. ¶¶ 81–87.

- Maher had information from a known and reliable informant that Cardwell, not Lewis, committed the murders. This information was corroborated by independent evidence. Yet, Maher failed to investigate this lead, falsely reported that the lead was unreliable, and buried his investigation of Cardwell. Compl. ¶¶ 90–98.

In short, Lewis's complaint alleges multiple instances of police misconduct—not just one—taking place over an extended period of time. The incidents involved coercive interrogations of at least three witnesses with the full knowledge of five officers, including supervisors, and the suppression by at least two officers of exculpatory evidence. This pattern of unconstitutional behavior on its own is enough to state a plausible claim that the City had a custom or policy of tolerating police misconduct. *See Tyus*, 2015 WL 1471643, at *11. But Lewis has gone one step further by linking this investigation to a longstanding practice within the NHPD of tolerating similar misconduct, showing that it is part of an unofficial, unconstitutional policy of police misconduct.

The City relies at some length on the district court's decision in *Tieman v. City of Newburgh*, a case in which the plaintiff had claimed that the city had a custom of police misconduct during arrests. *See* No. 13-cv-4178 (KMK), 2015 WL 1379652, at *2 (S.D.N.Y. Mar. 26, 2015). But *Tieman* was a case, unlike this one, that involved a single discrete incident—an unlawful use of force during an arrest. Without a pattern of police misbehavior against the plaintiff—like the pattern alleged by Lewis—the *Tieman* court was unimpressed by 13 instances of excessive force during a period when "hundreds, if not thousands" of arrests were made. *Id.* at *17. Here, by contrast, Lewis has pleaded a pattern of serious unconstitutional investigative misconduct directed toward him and has supported his allegations with examples of serious

12

unconstitutional investigative misconduct directed toward others. Only discovery will reveal whether the numerous examples of misconduct already alleged constituted the norm for NHPD's investigative practices. *See, e.g.*, *Gonzalez v. Waterbury Police Dep't*, 12-cv-478 (SRU), 2016 WL 953211, at *3 (D. Conn. Mar. 11, 2016) (describing how the Court granted additional discovery *at summary judgment* to determine whether plaintiff could "uncover a substantial number of excessive force complaints").

In sum, "determining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense." *Colon*, 2009 WL 4263362, at *2 (internal quotation marks omitted). Lewis has pleaded allegations of extraordinary misconduct resulting in his unjust conviction and has provided numerous additional examples of the NHPD coercing false statements, committing perjury, and destroying exculpatory evidence. He has adequately pleaded a pervasive pattern of unconstitutional investigations.

### 2. *The City is liable for failing to supervise and discipline NHPD personnel.*

Lewis's complaint alleges a second theory of *Monell* liability: failure to properly supervise NHPD officers despite widespread, and well-known, abuse and corruption. "The failure to train or supervise city employees may constitute an official policy or custom if the failure amounts to deliberate indifference to the rights of those with whom the city employees interact." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007). Such deliberate indifference "may be inferred where the need for more or better supervision to protect against constitutional violations was obvious, but the policymaker failed to make meaningful efforts to address the risk of harm to plaintiffs." *Cash*, 654 F.3d at 334 (internal quotation marks and citations omitted). "An obvious need may be demonstrated through proof of repeated complaints

13

of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995).

Lewis's complaint showed the "obvious need" for discipline that permeated the NHPD beginning as early as 1982. NHPD officers had a demonstrated history of coercing false statements, destroying or suppressing exculpatory evidence, and lying about it. No allegations in the complaint suggest that the City took any action to discipline the officers involved in this misconduct or to forestall future civil rights abuses. The complaint suggests, rather, that misconduct was rewarded. For example, Billy White was promoted repeatedly despite a documented history of "conduct unbecoming of an officer," fabricating evidence, threatening schoolchildren with violence, using racial slurs, and beating a 13-year-old boy for no apparent reason. Compl. ¶¶ 125–26. Indeed, the pattern of misconduct continued through the Turner-Fields murder investigation and persisted until at least 1998, when the NHPD buried evidence and tampered with witnesses in the investigation of the Phil Cusick murder. *Id.* ¶ 130.

Lewis has also alleged Raucci, in particular, was never disciplined for his widely known misconduct. As early as the 1980s, officers in the NHPD knew that Raucci was a "dirty cop" who fabricated evidence, did drugs, and worked with Parise's criminal organization. *Id.* ¶¶ 136–38. Chief Pastore himself learned from a civilian that Raucci was involved with Parise. *Id.* ¶ 139. During the high-profile investigation of the 1991 murder of Yale student Christian Prince, Raucci coerced a witness into providing a false statement, replete with details fed to him by Raucci, implicating Raucci's favored suspect. *Id.* ¶ 141. That misconduct happened *during the Turner-Fields* investigation and concluded before Lewis's 1995 conviction. Yet, the City made no effort to correct Raucci's unconstitutional investigative tactics or take him off of homicide

14

investigations. By early 1995, before Lewis's trial, Raucci's misconduct had become notorious enough to warrant an internal affairs investigation. The pattern continued after Lewis's trial—Raucci again coerced a false statement during the 1995 investigation of the Kevin "Goober" Brahan murder. *Id.* ¶ 142. Still, nothing was done to prevent Lewis's unjust conviction.

The City's pervasive failure to discipline problem officers put Raucci in a position where he could frame Lewis for the Turner-Fields murders. And the City's failure to train or supervise its police department led to the other defendants' complicity in the unconstitutional investigation. A city cannot condone police officers who use their power "in a way that is itself lawless," and "should not take a laissez-faire attitude toward the violation by its peace officers of the very rights they are supposed to prevent others from violating." *Fiacco v. City of Rensselaer*, 783 F.2d 319, 327 (2d Cir. 1986). For that reason, Lewis's failure-to-supervise claim should survive the motion to dismiss. *See Waller*, 89 F. Supp. 3d at 285–86; *Goode*, 2013 WL 1087549, at *7–8.

### 3. *Chief Pastore, the NHPD's final policymaker, permitted Raucci's tainted prosecution to proceed.*

Lewis has also alleged that the City should be held liable under *Monell* because Chief Pastore, as the final policymaker, endorsed his officers' unconstitutional conduct. The City's motion did not challenge this theory of liability, and any argument against it has been forfeited. In any event, Lewis more than adequately pleaded this claim.

Even one action by an official with "final authority to establish municipal policy with respect to the action ordered" is sufficient to establish a *Monell* claim. *Amnesty Am.*, 361 F.3d at 126. Whether an official possesses final policymaking authority is determined by state law. *See Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000). Connecticut law establishes that Chief Pastore was responsible for "providing police services" and for "the efficiency, discipline, and good

15

conduct" of the NHPD. New Haven Municipal Code, Tit. I, Art. VI, Sec. 10(A), (B).[1] He was thus the final policymaker with respect to supervision, training, and discipline of his subordinate officers.

Lewis's complaint alleges that Chief Pastore knew about Raucci's illicit association with known criminals and his coercive investigation practices. Chief Pastore knew specifically about Raucci's connection to Parise and his history of coercing false statements during high profile investigations. Compl. ¶¶ 139–41. Yet, Raucci continued to receive promotions, rising to become a homicide detective, where he was given free rein in handling sensitive investigations. *Id.* ¶¶ 119, 137. Pastore was also aware of the misconduct in this case, but did nothing to stop Lewis's conviction. Compl. ¶¶ 8, 135, 149, 163–64. As the final policymaker, his deliberate inaction bound the City to NHPD's unconstitutional misconduct, and Lewis's complaint stated a *Monell* claim on this basis alone.

**B. Raucci's misconduct occurred within the course and scope of his employment with the NHPD.**

In Count XII, Lewis brings a claim against the City under Conn. Gen. Stat. § 7-465 for indemnification of the individual defendants. The City does not dispute that Lewis may assert such a claim, nor does the City seek to dismiss this claim as to the acts and omissions of Defendants Maher, Sweeney, Pettola, Lawlor, or Pastore. Rather, the City argues only that it is not liable for *any* of Raucci's misconduct because he was not acting within the scope of his employment with the NHPD. *See* City's Mem. at 18–19. The City's argument, however,

---

[1] Although not relevant to this motion—because the City has not raised the argument—the City's answer suggests that the Chief of Police is subordinate to the Board of Commissioners and is thus not the final policymaker. That may be true for *some* areas of department administration. But Connecticut law makes clear that the "Chief of Police shall be responsible for the efficiency, discipline, and good conduct of the Department of Police Service." New Haven Municipal Code, Tit. I, Art. VI, Sec. 10(B).

misconstrues the meaning of "scope of employment" under Connecticut law and improperly asks the Court to make factual determinations absent any factual record. Lewis's complaint alleged that Raucci served two masters, using his authority as a NHPD detective to close the Turner-Fields murders *and simultaneously* to frame Lewis for the crimes.

1.  ***As a matter of law, Raucci's conduct falls within the course and scope of his employment so long as he was motivated in part to serve the NHPD.***

In its motion, the City summarily states that "[i]t is clear based on the allegations of the Complaint that Defendant Raucci was not acting with the 'scope of his employment' as required by Conn. Gen. State. 7-465." City's Mem. at 19 (citing Compl. ¶ 43 and *A–G Foods, Inc. v. Pepperidge Farm, Inc.*, 579 A.2d 69 (Conn. 1990)). But this point is not at all clear, and the City's motion conducts little of the required analysis.

"In determining whether an employee has acted within the scope of employment, courts look to whether the employee's conduct: (1) occurs primarily within the employer's authorized time and space limits; (2) is of the type that the employee is employed to perform; and (3) is motivated, at least in part, by a purpose to serve the employer." *Harp v. King*, 835 A.2d 953, 974 (2003). The first two factors unquestionably weigh heavily in favor of finding that Raucci acted within the scope of his employment. Raucci's misconduct was committed while he was on duty during the course of an assigned investigation, often in the precinct and in the presence of his supervisors or fellow detectives. Raucci created and prepared numerous reports, albeit allegedly false, pertaining to the investigation and maintained them in the Department's investigative file into the Turner-Fields murders. *See, e.g.*, Compl. ¶¶ 16, 26, 46–48, 50, 59, 100.

Thus the City's motion can only relies on the third factor—that Raucci was not motivated in any way by a desire to serve the NHPD. The City asserts, without support, that Lewis's allegation (made upon information and belief, *see* Compl. ¶ 43), that Raucci acted in

collaboration with Frank Parise means that he fails this test. But again, this is a misstatement of that law. Under Connecticut law, an employee acting with a *dual* purpose—both his own and his employer's—acts within the scope of his employment. *See, e.g.*, *Gutierrez v. Thorne*, 13 Conn. App. 493, 498 (1988) (finding scope of employment so long as the employee was not furthering "solely" his own affairs); *Mullen v. Horton*, 46 Conn. App. 759, 764 (1997) ("[T]he vital inquiry in this type of case is whether the servant on the occasion in question . . . was actuated *at least in part* by a purpose to serve a principal." (emphasis added)), *overruled on other grounds by Cefaratti v. Aranow*, 141 A.3d 752, 759 (Conn. 2016).

Thus, the Connecticut Supreme Court has explained that "[a]n employee acts within the scope of his employment as long as he is discharging his duties or endeavoring to do his job, *no matter how irregularly, or with what disregard of instructions.*" *Harp*, 835 A.2d at 976 (emphasis added) (quotation marks omitted). And Connecticut law has long held that an argument that "the servant disobeyed the orders of the master is never a sufficient defense [to vicarious liability]." *Son v. Hartford Ice Cream Co.*, 129 A. 778, 780 (Conn. 1925) (internal quotation marks omitted); *see also Pelletier v. Bilbiles*, 227 A.2d 251, 253 (Conn. 1967).

In this case, Plaintiff has clearly alleged that Raucci acted with a dual purpose—his own corrupt purpose and the NHPD's purpose of investigating the Turner-Fields murders. All of Raucci's misconduct was *investigative* misconduct that he engaged in as the lead detective assigned to the Turner-Fields investigation. His misconduct occurred during witness interviews, taped statements, and subsequent police reports—all basic steps taken in every police investigation. His ultimate goal was to close the case assigned to him by an NHPD superior, thereby taking the case off the Department's books. Although he may have completely disregarded the proper manner and instructions for conducting an investigation, the fact remains

18

that all of his alleged misconduct served the very end that he was assigned—closing the Turner-Fields murder investigation.

Indeed, courts in this Circuit considering similarly egregious police misconduct have found it to be within the scope of the officer's employment. *See, e.g.*, *Gibbs v. City of New York*, 714 F. Supp. 2d 419, 420 (E.D.N.Y. 2010) (granting summary judgment to *plaintiff* regarding City's respondeat superior liability for plaintiff's 18 years of wrongful incarceration as a result of misconduct by NYPD detective with ties to organized crime figure); *Morillo v. City of New York*, 95-cv-2176 (JSM), 1997 WL 72155, at *1, *7–8 (S.D.N.Y. Feb. 20, 1997) (officers planted evidence and testified falsely before grand jury acted within scope of employment).

Raucci's actions were motivated *in part* by his employer's directive to investigate the Turner-Fields murders and close the case. He did so by taking specific investigative steps in conjunction with other NHPD detectives and supervisors. Thus, as a matter of Connecticut law, Raucci's misconduct falls within the scope of his employment.[2]

---

[2] Even assuming that Raucci did not act in part to serve the NHPD's purposes, the City may still be required to indemnify Raucci because the City *ratified* Raucci's misconduct. In this case, Mr. Lewis has alleged, in great detail, that Chief Pastore and other NHPD supervisors were on notice of Raucci's pattern of unconstitutional and illegal behavior, failed to take any action to review Raucci's investigations or to discipline him for his misconduct, and instead promoted Raucci and permitted him to lead high-profile investigations. Compl. ¶¶ 134–35. Pastore was also aware of Raucci's drug habits. *Id.* ¶¶ 145–46. Pastore knew all of this when Mr. Lewis personally told Pastore that he was innocent of the murders and that Raucci was a corrupt officer who engaged in misconduct on Parise's behalf. *Id.* ¶ 163. Pastore, however, told Mr. Lewis that he stood by Raucci and then did nothing to investigate Mr. Lewis's information. *Id.* ¶¶ 163–64. Then, in 1999, after the FBI had concluded its investigation, the NHPD Chief refused the Mayor's request to reopen the investigation into the Turner-Fields murders. *Id.* ¶¶ 167–68. Should discovery support these allegations, the City would be estopped from attempting to walk back their ratification of Raucci's misconduct. Although Connecticut courts have emphasized that "the employer's consent of ratification of the misconduct" is not *required* for an indemnification claim, ratification is undoubtedly *sufficient*. *Cf. Belanger v. Village Pub I*, 26 Conn. App. 509, 520 (1992).

2.      *In the alternative, the Court should delay its decision on course and scope until the parties have developed the factual record.*

Raucci was acting within the scope of his employment when investigating the Turner-Fields murders, but, even assuming he deviated from serving the NHPD's interests and ends, the motion to dismiss should still be denied. "When an employee deviates from an employer's instructions, liability turns on the extent of the deviation, in light of the totality of the circumstances, which is generally a question of fact for the jury." *Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 989 F. Supp. 110, 118 (D. Conn. 1997), *aff'd in part and rev'd on other grounds*, 196 F.3d 409 (2d Cir. 1999); *see also A–G Foods*, 579 A.2d at 73; *Harp*, 835 A.2d at 974–76.

The City contends that Lewis's complaint forecloses any argument that Raucci acted on behalf of the City because it alleged that he was acting on behalf of Parise's organized crime operation instead. *See* Ds.' Mem. at 19; Compl. ¶ 43. But this allegation is disputed; Raucci denies it in his answer. *See* Dkt. # 37 at 6. The jury could decide this factual question against Lewis and still conclude that Raucci coerced false witness statements for other reasons— indolence, for example, or a misplaced faith in Lewis's guilt. This question should not be resolved on a motion to dismiss because the jury should conduct "the fact-intensive inquiry dictated by Connecticut law" after both sides have amassed their discovery. *Kilduff v. Cosential, Inc.*, 289 F. Supp. 2d 12, 19 (D. Conn 2003) (citing *A–G Foods*, 579 A.2d 69). Indeed, courts have reached similar conclusions in cases involving sexual abuse and misconduct, which are certainly farther removed from the allegations of misconduct in this case. *See, e.g.*, *Doe v. Norwich Roman Catholic Diocesan Corp.*, 309 F. Supp. 2d 247, 252 (D. Conn. 2004) (*denying motion to dismiss* claim against diocese when subordinate counselor allegedly assaulted plaintiff in an attempt to bring plaintiff closer to Church); *Martinelli*, 989 F. Supp. at 118 (reviewing

20

plaintiff's allegations that priest attempted to teach the sacraments to him and other teenage boys by using sexual contact, and *denying summary judgment* for the diocese because there was a genuine dispute as to whether the priest's activities represented a "total departure from the [d]iocese's business").[3]

### C.  Lewis's negligence causes of action should proceed against the City.

Lewis has pleaded two negligence cause of action, Counts IX and X, against the individual defendants, which, under Conn. Gen. Stat. § 52-557n, he also brings against the City on a theory of *respondeat superior*. Under § 52-557n, the City is liable for the "negligent acts and omissions" of its employees. The City correctly argues that § 52-557n prevents Lewis from bringing any non-negligence state-law claims directly against the City, and his complaint should not be read to do so.

### V.    CONCLUSION

Lewis has adequately alleged that Defendants engaged in a consistent pattern of unconstitutional misconduct over a long period of time in order to secure his conviction. Lewis has plausibly pleaded that this misconduct was part of a custom, pattern, or practice of similar misconduct within the NHPD at the time of his conviction. Lewis respectfully requests that the Court deny the motion in full and permit the parties to proceed to discovery on each claim.

Dated: New York, New York

---

[3] Applying New York law, the Second Circuit recently reversed a grant of summary judgment on a similar scope of employment issue, determining that the district court should not have resolved the factual disputes at issue absent additional factual discovery. *See Fountain v. Karim*, 838 F.3d 129, 138 (2d Cir. 2016) ("The district court dismissed all claims against the government for lack of subject matter jurisdiction . . . after finding that he was not acting within the scope of his employment at the time of the accident. We conclude that, although such a finding properly made would warrant dismissal in an FTCA action, *dismissal in this case was premature in light of an unresolved factual dispute over whether Karim used the vehicle with his employer's implied permission.*" (emphasis added)).

December 6, 2016                          Respectfully Submitted,


                                          /s/ Emma Freudenberger
                                          Nick Brustin, phv08609
                                          Emma Freudenberger, phv08602
                                          Farhang Heydari, phv08603
                                          Rick Sawyer, phv08601
                                          Neufeld Scheck & Brustin, LLP
                                          99 Hudson Street, 8th Floor
                                          New York, NY 10013
                                          Tel: (212) 965-9081
                                          Fax: (212) 965-9084


                                          Richard Emanuel, ct12152
                                          Law Offices of Richard Emanuel
                                          246 Goose Lane
                                          Suite 106
                                          Guilford, CT 06437
                                          Tel: (203) 689-5761
                                          Fax: (203) 689-5762

## **CERTIFICATION**

I hereby certify that on December 6, 2016 *Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss* was filed electronically and served by mail, if necessary, on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to any one unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

/s/ Emma Freudenberger
Emma Freudenberger