UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SCOTT T. LEWIS,
    Plaintiff,

v.

CITY OF NEW HAVEN, *et al.*,
    Defendants.

No. 3:16-cv-1382 (SRU)

# RULING AND ORDER

On August 15, 2016, the plaintiff, Scott Lewis, filed a complaint under 42 U.S.C. § 1983 alleging, *inter alia*, that unconstitutional policies implemented by the defendants, the City of New Haven and Nicholas Pastore acting in his official capacity as the Chief of New Haven's Police Department during the relevant period (collectively, "the City"),[1] permitted Lewis to be wrongfully prosecuted, convicted, and incarcerated in violation of his constitutional rights. (doc. 1) The complaint also seeks indemnification and direct-action claims against the City for the related alleged misconduct of its employees, *see* Conn. Gen. Stat. §§ 7-465 and 52-571. On November 15, 2016, the City filed a motion to dismiss, in whole or in part, all of the claims against it. (doc. 39)

For the following reasons, the City's motion is denied in substantial part.

**I.    Standard of Review**

  A.  <u>Motion to Dismiss for Failure to State a Claim Upon Which Relief May Be Granted</u>

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) is designed "merely to assess the legal feasibility of a complaint, not to assay the weight of evidence which

---

[1] "Section 1983 claims against municipal employees sued in their official capacity are treated as claims against the municipality itself." *Seri v. Town of Newtown*, 573 F. Supp. 2d 661, 671 (D. Conn. 2008) (citations omitted).

might be offered in support thereof." *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984) (quoting *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980)).

When deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiffs, and decide whether it is plausible that plaintiffs have a valid claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007); *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996).

Under *Twombly*, "[f]actual allegations must be enough to raise a right to relief above the speculative level," and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face." 550 U.S. at 555, 570; *see also Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). The plausibility standard set forth in *Twombly* and *Iqbal* obligates the plaintiff to "provide the grounds of his entitlement to relief" through more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (quotation marks omitted). Plausibility at the pleading stage is nonetheless distinct from probability, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claims] is improbable, and . . . recovery is very remote and unlikely." *Id.* at 556 (quotation marks omitted).

II. **Background**

The following allegations asserted in the complaint are taken as true for the purposes of the motion to dismiss. (doc. 1) Lewis primarily alleges that he was framed for two murders by Vincent Raucci, a Detective for the New Haven Police Department ("NHPD"), acting at the

behest of Frank Parise, an organized-crime figure and drug dealer. *See id.* at ¶¶ 39–43. Lewis was initially arrested on April 15, 1991, *id.* at ¶ 102; re-arrested on September 12, 1994, *id.* at ¶ 106; and found guilty of the murders on May 10, 1995, *id.* at ¶ 115. After a key witness recanted his statements and another NHPD officer testified about misconduct during the investigation, however, Lewis's habeas petition for release was granted on December 16, 2013, and he was released from custody on February 26, 2014. *See id.* at ¶¶ 169–75; *see also Lewis v. Comm'r of Corr.*, 975 F. Supp. 2d 169 (D. Conn. 2013), *aff'd by Lewis v. Comm'r of Corr.*, 790 F.3d 109 (2d Cir. 2015). On August 5, 2015, all charges against Lewis were formally dismissed. Compl. at ¶ 177.

Lewis alleges that his arrest, conviction, and incarceration were obtained by Raucci through a concerted campaign to fabricate or coerce witness statements, *see id.* at ¶¶ 45–58, 71–80, 81–88, and to suppress an alternative credible lead, *see id.* at ¶¶ 89–98. He alleges that several other NHPD officers were either actively involved in or witnessed Raucci's misconduct. *See id.* at ¶¶ 48, 59–70, 76–78, 84. One of those officers informed his supervisor about the misconduct in 1991, before Lewis was convicted, but the supervisor did not intervene. *See id.* at ¶¶ 67–70.

Pastore and other supervising officers were aware of Raucci's misconduct in the investigation before Lewis was convicted, but failed to intervene. *See id.* at ¶ 163 (alleging that Pastore admitted to Lewis that he knew Lewis was innocent and that Raucci was corrupt); *see also id.* at ¶ 69 (alleging that another supervisory officer knew at the time of the investigation that Raucci was "troublesome"). Pastore and other supervising officers were also aware that Raucci had engaged in other misconduct before, during, and after Lewis's conviction. *See id.* at ¶¶ 136–49. Other officers had witnessed Raucci attempt to plant drugs on a suspect in the late

3

1980s, *id.* at ¶ 136, and interact with Parise without any legitimate police purpose, *id.* at ¶ 138. One officer informed Pastore on multiple occasions that Raucci was corrupt. *Id.* at ¶ 139. In 1995, prior to Lewis's conviction, an internal investigation determined that Raucci had hit a suspect in the face with a gun and lied about the incident. *Id.* at ¶ 144. Pastore was also aware that Raucci had engaged in a similar pattern of coercing witness statements in murder investigations before and shortly after Lewis was convicted. *Id.* at ¶¶ 139–142. And prior to Lewis's conviction, Pastore was aware that Raucci was using illegal drugs. *Id.* at ¶¶ 145–47. Pastore took no steps to discipline Raucci for any of that conduct, nor did he intervene in the investigation.

In 1996, Raucci was suspended and eventually resigned after an NHPD internal investigation determined that he had accepted overtime pay for work he did not perform. *Id.* at ¶ 148. The City failed to investigate Raucci's prior work for years after he was disciplined and resigned from the Department. An independent FBI investigation into Raucci indicated that Raucci had ties to Parise, an ongoing drug problem, and that other officers had repeatedly witnessed him engaging in misconduct. *Id.* at ¶ 159. In addition, the FBI obtained statements from key witnesses in Lewis's case indicating that Raucci had coerced their incriminating testimony. *Id.* at ¶ 160–61. On the basis of the FBI report, on May 12, 1999—four years after Lewis was convicted—John DeStefano, Jr., then-Mayor of New Haven, formally requested that the investigation into the murders for which Lewis was convicted be reopened. *Id.* at ¶ 167. The NHPD declined to do so. *Id.* at ¶ 168.

In addition to alleging knowledge of Raucci's ongoing misconduct, including with respect to Lewis, the complaint alleges that the City failed to adequately supervise or discipline numerous other officers engaged in misconduct throughout the 1980s and 90s. *See id.* at ¶¶ 120–

30. It identifies two instances when a jury found that an NHPD officer knowingly filed a false report, *id.* at ¶¶ 120, 122; one instance of an NHPD officer admitting that he omitted and misquoted witness statements, *id.* at ¶ 121; two instances of witnesses testifying that other NHPD officers had subjected them to the same coercive interrogation techniques used by Raucci to frame Lewis, *id*. at ¶¶ 123, 124; an officer subject to fourteen complaints between 1986 and 1993 without discipline, *id.* at ¶ 129; an officer arrested for charges related to the suppression of evidence and hindering an investigation, *id.* at ¶ 130, and one instance when an officer found by internal investigations to have fabricated evidence and made racially-charged threats of violence in the 1980s was not seriously disciplined, and was in fact promoted by Pastore in the 1990s, *id.* at ¶ 126. In the latter case, the officer was eventually arrested for and convicted of corruption-related charges in the mid-2000s. *Id.*

The complaint also alleges that NHPD had a "long-standing pattern of concealing exculpatory information." *Id.* at ¶ 131. It identifies at least eight cases between 1984 and 1992 in which a state court found that the NHPD inappropriately destroyed tape recordings of witness statements. *Id.*

### III. Discussion

The City moves to dismiss the section 1983 municipal liability claim against it, the state law claim for indemnification of its employees, and the state law claim for direct action to the extent that it involves any intentional tort claim. Lewis concedes that the direct action claim cannot be asserted against the City for any intentional tort claims, *see* Pl.'s Opp'n Br. at 21, and accordingly that portion of the City's motion is **granted** and will not be discussed further.

5

A. Section 1983 Claim

In *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the Supreme Court held that a municipality may not be held liable under section 1983 for the constitutional torts of its employers solely on a *respondeat superior* basis. *Id.* at 690. Instead, in order to establish municipal liability, the plaintiff must prove three elements: (1) the existence of an official policy or custom; (2) that caused the plaintiff's harm; (3) which harm is the denial of a constitutional right. *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995). Only the first element is apparently at issue in the instant motion to dismiss.[2]

To establish the policy element, a plaintiff may show either: (1) the existence of an official policy, *Monell*, 436 U.S. at 690; (2) that an official with final policy-making authority took action or made a specific decision that caused the deprivation, *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986); or (3) the deprivation was caused by an unlawful practice amongst subordinate officials that was sufficiently widespread to imply constructive acquiescence by policy-making officials, *City of St. Louis v. Prapotnik*, 485 U.S. 112, 127 (1988).

Lewis asserts his section 1983 claim against the City on three theories. First, he alleges that Pastore was an official with final policy-making authority, and that his failure to intervene to stop or correct Raucci's misconduct constitutes either a ratification or deliberate indifference to that misconduct. *See* Compl. at ¶¶ 215–17. Second, he asserts that the City had two varieties of unconstitutional practice that, although not officially endorsed, were so widespread that they constituted an official policy or custom—namely, an acquiescence in the widespread use of

---

[2] To the extent that the City's citation to *Roe v. City of Waterbury*, 542 F.3d 31 (2d Cir. 2008), which appears to discuss the causation element of a section 1983 *Monell* claim, is intended to argue that element is not met in the present case, it is unsuccessful—as discussed below, if Lewis has adequately alleged that the City had a policy of acquiescence in Raucci's misconduct, then he has also alleged that policy was a direct cause of his constitutional injury, namely, his wrongful prosecution and conviction.

unconstitutional investigative techniques, *id.* at ¶¶ 218–19, and a failure to train officers in a manner that would prevent the use of such practices, *id.* at ¶¶ 220–21.[3] I discuss the sufficiency of the allegations supporting each of those theories in turn.

1. *Allegations that Pastore, as Final Policymaker, Ratified Raucci's Misconduct*

Lewis argues that he may hold the City liable because he has adequately alleged that Pastore, as final policymaker, violated Lewis's constitutional rights by ratifying Raucci's misconduct. Pl.'s Opp'n Br. at 15–16. He points out that the City has failed to move to dismiss his *Monell* claims to the extent they are predicated on that theory.

When a plaintiff asserts a *Monell* claim on the basis of a single municipal employee's conduct, rather than on the basis of a city-wide policy or practice, "the inquiry focuses on whether the actions of the employee in question may be said to represent the conscious choices of the municipality itself." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir. 2004). The acts of an official with final policy-making authority are deemed to meet that test. *See id.* (citing *Pembaur*, 475 U.S. at 481–82). "Even a single action" by a final policymaker "is sufficient to implicate the municipality in the constitutional deprivation for the purposes of § 1983." *Id.* The Second Circuit has also recognized that "where senior personnel have knowledge of a pattern of constitutionally offensive acts by their subordinates but fail to take remedial steps,

---

[3] The complaint, in fact, asserts municipal liability on the basis of the NHPD's "custom, pattern or practice of unconstitutional techniques" and on the basis of the NHPD's "failure to supervise, discipline, and train" its officers not to engage in such practices. *See* Compl. at 43–44. When an informal policy is asserted as the basis of *Monell* liability, the key question, as discussed further below, is whether the municipality displayed "deliberate indifference" to the misconduct. Discovery may subsequently supply a distinction between Lewis's alternative theories that the City either actually had an informal policy of using unconstitutional witness-tampering practices, deliberately turned a blind eye to such practices through inadequate investigation and discipline, or failed to put in place safeguards that it knew could prevent them; however, for all practical purposes at the motion to dismiss stage, Lewis's theories are all predicated on circumstantial allegations of numerous instances of misconduct and whatever intent I might reasonably infer on the part of the City when it allegedly failed to make an adequate response. Accordingly, for the purposes of simplicity, I treat Lewis's allegations regarding the City's failure to supervise or discipline officers in response to complaints or known misconduct as part of an "acquiescence" theory of liability, and his allegations that the City failed to put in place adequate safeguards or training that could have prevented misconduct as part of a "failure to train" theory.

the municipality may be held liable for a subsequent violation if the superior's inaction amounts to deliberate indifference or to tacit authorization of the offensive acts." *See Turpin v. Mailet*, 619 F.2d 196, 201 (2d Cir. 1980).

Lewis has alleged that Pastore was Chief of the NHPD from 1990 through 1997. Compl. at ¶ 15. That fact, read in light of New Haven's municipal code, is sufficient to plausibly allege that Pastore was the final policymaker when he assigned responsibility for the investigation to Raucci and when he failed to discipline or supervise Raucci for misconduct. *See* New Haven Municipal Code, Tit. I, Art. VI § 10(b) ("[The] Chief of Police shall be responsible for the efficiency, discipline and good conduct of the Department of Police Service.").

Lewis's allegation that Pastore had actual and constructive knowledge of Raucci's misconduct relies on a series of fairly specific incidents. *See, e.g.*, Compl. at ¶ 136–49. In particular, Lewis alleges that Pastore was aware that Raucci had engaged in a similar pattern of coercing witness statements in murder investigations before and shortly after Lewis was convicted, but nevertheless permitted Raucci to serve as the lead investigator on high-profile murder cases. *Id.* at ¶¶ 139–142. Lewis further alleges that prior to his conviction, Pastore was aware that Raucci was using illegal drugs but failed to discipline or supervise his work, or otherwise intervene. *Id.* at ¶¶ 145–47. Finally, Lewis alleges that Pastore admitted that he was aware of Raucci's misconduct in developing the case against Lewis and nevertheless failed to intercede. *Id.* at ¶¶ 163–64.

Based on those allegations, I hold that Lewis has plausibly alleged that Pastore, acting as a final decisionmaker for the City, made a conscious decision not to supervise or intervene in Raucci's work despite numerous indications of serious misconduct, which decision led directly to Lewis's wrongful prosecution and conviction. That holding alone would be sufficient to keep

8

both the City as a municipal entity and Pastore, acting in his official capacity, as defendants in this case with respect to at least some of the violations alleged; however, I continue to examine the remaining grounds of Lewis's *Monell* claims.

    2.  *Allegations that the City Acquiesced in Unconstitutional Investigative Techniques*

Lewis's second theory of liability is best understood as a broader-sweeping version of his first—he alleges that the City was knowingly and deliberately indifferent to the possibility that its officers were routinely engaging in unconstitutional investigative techniques. In support of that theory, Lewis relies on, *inter alia*, previous instances in which New Haven police officers improperly interfered with witness statements as well as the allegations regarding the conduct of Raucci and his collaborators in Lewis's own case.

"Where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a 'deliberate choice,' that acquiescence may 'be properly thought of as a city "policy or custom" that is actionable under § 1983.'" *Amnesty Am.*, 361 F.3d at 126 (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)) (internal citation omitted)). To prove such deliberate indifference, the plaintiff must show that the need for more or better supervision to protect against constitutional violations was obvious. *See Canton*, 489 U.S. at 390. "An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Vann v. City of N.Y.*, 72 F.3d 1040, 1049 (2d Cir. 1995) (citing *Ricciuti v. N.Y.C. Transit Authority*, 941 F.2d 119, 123 (2d Cir. 1991); *Fiacco v. City of Rensselaer*, 783 F.2d 319, 328 (2d Cir. 1986)). "There is no bright line rule for how many complaints of civil rights violations is sufficient to show the need for more supervision, nor is

there a bright line rule for how recent those complaints must be." *Tieman v. City of Newburgh*, 2015 WL 1379652, at *20 (S.D.N.Y. Mar. 26, 2015).

Lewis has plausibly alleged that the City exhibited a pattern of deliberate indifference to claims of coerced or fabricated testimony.[4] In Lewis's case alone, he alleges that at least three key witnesses complained that their statements had been coerced or otherwise tried to recant those statements *before* he was convicted, *see* Compl. at ¶¶ 87, 88, 102, 108, and 112; and that at least one supervising officer was informed that Raucci had fabricated the statement of a key witness, *see id.* at ¶ 68, but that no investigative action was taken. He asserts that the City also failed to investigate similar complaints of coercion against Raucci in at least two other specified cases, one in 1991, at the outset of Raucci's investigation of Lewis, and one in August 1995, shortly after Lewis was convicted. *See id.* at ¶¶ 141, 142. And he further alleges that there were contemporaneous complaints of extremely similar methods of witness coercion against two other officers during the same time period. *See id.* at ¶¶ 123, 124. Finally, he alleges that the Chief of Police who followed Pastore apparently deliberately hindered the investigation of witness tampering complaints in 1996. *Id.* at ¶¶ 130.

That number of instances is sufficient at the motion to dismiss stage. *See Goode v. Newton*, 2013 WL 1087549, at *8 (D. Conn. Mar. 14, 2013) (holding that allegations of two instances of "manufactured criminality" over the course of six months in the plaintiff's own case and one incident of falsifying a police report in the previous year were sufficient to survive a motion to dismiss a *Monell* claim); *see also Ferrari v. Cty. of Suffolk*, 790 F. Supp. 2d 34, 46

---

[4] I note that Lewis's allegations regarding other officers accused of engaging in other kinds of misconduct, and in particular, racially charged abuses, are not clearly probative of whether the City deliberately failed to investigate the kind of misconduct that led to Lewis's harm. *See, e.g.*, Compl. at ¶¶ 125–29. Lewis has not alleged that his harm was due to racially discriminatory animus, nor to the appointment of "bad cops" to the community policing programs. Although those allegations, if true, raise serious concerns about the NHPD during that period, they are not sufficiently closely related to Lewis's own case to provide a basis for municipal liability to *him*.

(E.D.N.Y. 2011) (three alleged instances where officers presiding over retention hearings engaged in misconduct); *Reyes v. Cty. of Suffolk*, 995 F. Supp. 2d 215, 231 (E.D.N.Y. 2014) (more than three instances of same). I am also mindful that, when a plaintiff seeks to assert *Monell* liability through an acquiescence theory, much of the crucial information about how the municipality investigated complaints or disciplined bad actors is not available to the public. *See Ambrose v. City of New York*, 623 F. Supp. 2d 454, 478 (S.D.N.Y. 2009). Accordingly, I hold that Lewis has plausibly alleged *Monell* liability on an "acquiescence" theory against the City.

      3.  *Allegations that the City Failed to Train*

Finally, Lewis seems to have alleged the City failed to adequately train officers who engaged in misconduct. To the extent that portion of the complaint actually raises a "failure to supervise or discipline" claim, that theory overlaps with the "acquiescence" theory discussed above. But the complaint also suggests a separate "failure to train" theory.

Liability based on a failure to train is the most tenuous form of municipal liability under *Monell*. Like the "acquiescence" theory above, a failure to train claim requires an allegation that the municipality showed "deliberate indifference" to the risk that civil rights would be violated by the lack of training. Courts in the Second Circuit have articulated the required showing of deliberate indifference for such a "failure to train" claim as follows:

> (1) a policymaker knows to a moral certainty that her employees will confront a given situation; (2) the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation; and (3) the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights.

*Jones v. City of New York*, 2016 WL 1322443, at *8 (S.D.N.Y. Mar. 31, 2016) (internal quotation marks and citations omitted); *see also Tieman*, 2015 WL 1379652, at *19.

Lewis cites to Connecticut cases disapprovingly describing numerous occasions on which NHPD officers inappropriately destroyed taped witness statements, indicating an obvious need for training on that issue, which the City apparently failed to undertake. *See* Compl. at ¶ 131 (collecting cases). But the misconduct in Lewis's case did not involve the inappropriate destruction of taped statements—rather, it involved the coercion of such statements before the taping began. Accordingly, it is not clear how or whether the City's failure to train on that issue caused Lewis's harm, and Lewis has not clearly alleged any other "particular omission in [the City's] training program" that would be likely to cause harm of the variety that Lewis suffered. *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

Thus, if failure to train was the sole theory for *Monell* liability, the complaint may not have survived against the City; accordingly, to the extent that Lewis wishes to pursue a failure to train theory of *Monell* liability, he can file an amended complaint that sets forth in greater detail the basis and support for that theory. As discussed above, however, Lewis has more than adequately alleged municipal liability on the basis of Pastore's own conduct, as well as on an acquiescence theory, so the City's motion to dismiss the section 1983 claims against it is **denied**.

B.  Indemnification Claim

Lewis also brings an indemnification claim against the City of New Haven under Conn. Gen. Stat. § 7-465(a), which provides in relevant part that a municipality shall indemnify its employees for any damages awarded for a violation of the plaintiff's civil rights "if the employee, at the time of the occurrence . . . complained of, was acting in the performance of his duties and within the scope of his employment, and if such occurrence . . . was not the result of any wilful or wanton act of such employee in the discharge of such duty."

The City argues that Lewis has not adequately alleged that Raucci was acting within the scope of his employment when he caused Lewis's injuries because Lewis also alleges that Raucci was acting on behalf of Parise. As a preliminary matter, I note that the City apparently has not challenged Lewis's assertion that any of the other defendant-officers were acting within the scope of *their* employment when they allegedly assisted Raucci in his misconduct. Moreover, as the City recognized in its own brief, it is well established that an employee will be deemed to be acting in the scope of his employment if he "was actuated at least in part by a purpose to serve [his employer]." *See* Defs' Mot. to Dismiss Br. at 19 (quoting *A-G Foods, Inc. v. Pepperidge Farm, Inc.*, 216 Conn. 200, 210 (1990) (internal quotation marks and citation omitted)). Raucci's alleged misconduct clearly did not constitute an abandonment of his employment as a police detective—to the contrary, investigating a murder, conducting witness interviews, and building a case against a suspect are exactly the kinds of assignments for which Raucci was employed. Accordingly, the City's motion to dismiss Lewis's indemnification claim is **denied.**

## IV.   Conclusion

The defendants' motion to dismiss is **granted in part and denied in part**. The motion is **denied** with respect to the *Monell* and indemnification claims against the City of New Haven and Pastore, acting in his official capacity. The motion is **granted** to the extent that it seeks to exclude from Lewis's direct action claim any intentional tort claims. The defendants shall file an answer to Lewis's complaint by February 19, 2017 and shall comply with the discovery and motion deadlines I imposed on the other parties on December 15, 2016 (doc. 47).

So ordered.

Dated at Bridgeport, Connecticut, this 10th day of January 2017.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge